**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence DUBÉ, Defendant-Appellant.**

**No. 86–1449.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 1, 1986.

Decided May 28, 1987.

---

Theodore T. Scudder, Ruff, Weidenarr & Reidy, Ltd., Chicago, for defendant-appellant.

Deborah A. Devaney, Asst. U.S. Atty., Anton R. Valukas-U.S. Atty., Chicago, for plaintiff-appellee.

Before BAUER, Chief Judge, and WOOD and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This appeal involves a former commercial airline pilot who sought to satisfy his opposition to paying income taxes by belatedly getting "religion." However, that only got him indicted and convicted of willfully attempting to evade and defeat his income tax for the year 1981, a felony,[1] of failing to file tax returns for the years 1981, 1982, and 1983,[2] and of submitting during the latter part of 1982 [3] three false Employee's Withholding Allowance Certificates (Form W-4) to his employer, these latter charges being misdemeanors. The defendant was acquitted on six charges relating to the prior years of 1978–1980.

The defendant-appellant Dubé raises three issues: first, whether the defendant's tax-related conversations with a minister were privileged, second, whether the district court properly admitted evidence of a particular civil tax case to which defendant was not a party, and third, whether the jury was properly instructed on the issue of willfulness.[4]

## I. FACTUAL BACKGROUND

The defendant, Larry Dubé, learned to fly for the United States Air Force in 1954 and served in the military for about ten years.[5] He was then hired by United Airlines and flew for United for twenty years. In April 1978 he was promoted to first officer on a Boeing 747 and in July was promoted to captain, with substantial increases in salary for both promotions. For the year 1981 his total wages were $91,538.18.

The defendant had married three times, being twice divorced. Dubé had one natural child from his second marriage. This child was dyslexic. He also adopted his second wife's two daughters from a prior marriage. Dubé and his third wife were married in 1972 and had three children. During the early years of his third marriage the defendant paid his income taxes.

---

1. Count IV alleged a violation of 26 U.S.C. § 7201, in that the defendant had gross income of approximately $91,706 and taxable income of $65,254 upon which he owed a tax of approximately $22,515.

2. Counts VIII, IX and X alleged violations of 26 U.S.C. § 7203.

3. Counts XI, XII and XIII alleged violations of 26 U.S.C. § 7205.

4. The defendant was sentenced to three months imprisonment on Count IV, which has been served, and three years probation on the remaining counts.

5. The defendant, who served overseas although not in combat situations, was recommended for several decorations for accomplishing a difficult "dead-stick" landing of an F–104, but the decorations were not awarded.

He considered himself to be a nominal church member.

The defendant describes his religious conversion as beginning when his sixteen-year-old dyslexic son was sent to a psychiatric facility. About this time, January or February of 1978, he bought a book in a drugstore entitled *What the World is Coming To,* by Pastor Chuck Smith, which, the defendant says, impacted on his religious outlook. His two large pay raises came shortly after that in April and July of 1978. During this period Dubé's conversion occurred. About a month after his first promotion he sent for literature about the Life Science Church, a church which claimed to bestow certain tax advantages. In May of 1978 he decided to join, sent in $500, and by mail soon received his "credentials" which ordained Dubé a minister and a doctor of divinity, and granted a charter for a church. Included was a form entitled "Vow of Poverty" which the defendant signed. For another $100 Dubé's wife also became a minister. He designated part of his home as a Life Science Church.

The head of Life Science, William Drexler, was a lawyer, but he referred to himself as a Bishop and Chief of Order of Almighty God. Much of the material the defendant received from the Bishop, however, was concerned with taxes and not with religion. The Bishop's theory was that the church was tax exempt and that if the defendant, under his "vow of poverty," continued his flying as a minister of the church and donated his entire income to the church he established, then whatever he drew back from the church for his own personal purposes was exempt from all taxation. The type of "poverty" Dubé achieved by signing the "vow of poverty" is likely to cause wonderment among certain recognized religious orders.[6] Over time the defendant, in addition to what he withdrew for his own use, however, did make contributions to various recipients, such as family members, churches, and oth-

ers, some of which were recognized as charitable.

About a week after receiving his credentials the defendant began to take advantage of his new divinity status by sending to United Airlines his W–4 claiming eighty-five withholding allowances. This action was intended to stop all federal tax withholding, as the defendant explained in an accompanying letter to United Airlines. The IRS began to show some interest as the defendant received notice that his 1976 tax return was to be audited.[7] He immediately directed his bank not to honor any IRS summonses.

Later in 1978 Dubé began corresponding with United Airlines about his tax status. United advised the defendant that he was not exempt. He complained in a letter to a member of another Life Science Church, Bishop Sumption, that United Airlines had refused to recognize his position. He stated that the IRS was confiscating his property against his will to support socialistic programs to which he was religiously and morally opposed. He began to sign his correspondence as "Reverend."

In 1979, after reading in a national news magazine that Life Science Church was a sham church with tax-protester members, the defendant changed his church's name and became affiliated with the Basic Bible Church, as Bishop Sumption had also decided to do. This new church, however, had similar tax policies, and, incidentally, included other commercial pilots as members. For $600 the defendant received a new set of credentials and thereby became not only a minister and doctor of divinity, but also a bishop and an apostle. He continued his same tax policies.

In 1980 Bishop Sumption led Dubé to yet another church. This time it was called the Community Church of Truth, and the price was increasing: it was now $750. Within about two months the IRS first directly contacted the defendant. The defendant tried to contact the Bishop of the Basic

---

6. Later, other similarly poverty-stricken commercial pilots who owned pleasure boats, condominiums, and private planes were convicted for tax fraud.

7. This civil audit culminated with the defendant paying an additional sum of $300 to the IRS.

Bible Church, but got no response.[8] Dubé, apparently feeling the need for even more religion, then sought to join the Christian Assembly of God Church in Zion, Illinois, a recognized church, not a tax church. His relationship with the pastor of that church, Michael Ciociola, and their conversations, are the basis of the claimed privilege which the defendant says was breached by the admission at trial of the pastor's testimony.

The defendant at this time received an inquiry from IRS as to why he had failed to file his 1978 return. Dubé's unsatisfactory tax payment situation was not cleared up, so in 1982 the IRS directed United Airlines to overwithhold from the defendant's wages. As a result no taxes were due from the defendant for 1982 or 1983. In the fall of 1982 Dubé filed three W-4's with United Airlines in which he again claimed to be exempt. The IRS investigation turned into a criminal investigation.

## II.  DISCUSSION

### A.  The Claim of Privilege

■ The defendant claims that Reverend Ciociola's testimony should have been excluded under what he labels a "believer-clergyman" privilege, and the government denies that what it calls the "priest-penitent" privilege was applicable to the particular conversations between Reverend Ciociola and the defendant. To use the term "priest" as the government does, although a common practice, *see, e.g., Trammel v. United States,* 445 U.S. 40, 45, 51, 100 S.Ct. 906, 909, 912, 63 L.Ed.2d 186 (1980), might suggest application only to a particular religion not involved in this case; we will therefore refer to it simply as the clergy-penitent privilege.[9]

Referring to another type of claimed privilege, Learned Hand, in *McMann v. SEC,* 87 F.2d 377, 378, *cert. denied,* 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937)

commented that, "[t]he suppression of truth is a grievous necessity at best." Because testimonial privileges contravene the fundamental principle that the public has a right to every person's evidence, privileges must be strictly construed so as to be applied only to the very limited extent that "excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel,* 445 U.S. at 50, 100 S.Ct. at 912 (citing *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)). The Court in *Trammel* explained in dicta that the clergy-penitent privilege is limited to private communications rooted in confidence and trust. The privilege "recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." 445 U.S. at 51, 100 S.Ct. at 913. If, however, one seeks out the clergy only for income tax avoidance, we see no more need for a protective privilege than if the taxpayer had consulted his butcher or barber. The taxpayer is not a penitent seeking spiritual relief from his sins, only a citizen seeking relief from his obligation to pay taxes.

In 1980, in the same month that Dubé applied to join the Community Church of Truth, he and his wife also joined the Christian Assembly of God Church where Ciociola was pastor. Before he became a member, the defendant told Ciociola that he, Dubé, was tax exempt because he was a minister. Ciociola merely responded with "Oh." Ciociola testified to three or four more tax conversations with the defendant over the next two-and-a-half years which generally occurred in a public restaurant. Ciociola testified that the defendant "mentioned on [one] occasion that the vow of

---

**8.** In 1981 the Bishop and other members of the Basic Bible Church were indicted for tax fraud; the Bishop and a group of Braniff pilots were later convicted. In a letter to a "minister" acknowledging these indictments the defendant wrote, "We either regain our freedom in this country or I'll see you in the internment camp!"

**9.** This privilege, of course, would apply in other cases to ordained ministers, rabbis, Christian Science practitioners, as well as priests.

poverty entailed one's ability to take all his resources and use them for the church. In using those resources for the church, you were thereby tax-exempt because you could do things with that money that normally you couldn't do." Ciociola, in their conversations, explained to the defendant that the teaching he had received about taxes was that pastors of even small struggling churches had to pay income taxes on wages they received from the church, as well as on income from any additional outside employment. Ciociola checked further with the legal counsel for his church who reaffirmed the tax opinion which Ciociola had explained to Dubé. Ciociola passed this correct income tax information to the defendant. Dubé, Ciociola believed, was relying on the tax information Dubé had received with his mail-order credentials when he joined the Life Science Church and the Basic Bible Church. Ciociola advised the defendant that he should seek tax advice outside those churches because of the complications that had arisen with the IRS.

Ciociola in his testimony revealed nothing from any conversations he may have had with the defendant which related in any way to defendant's spiritual confidences. Ciociola's testimony related only to Dubé's efforts to relieve himself from the necessity of paying income taxes. The mere fact that Ciociola was a legitimate pastor did not cast a privilege around all or whatever Ciociola and Dubé happened to talk about. In this case, their conversations were only about the defendant's efforts to avoid paying his taxes. This was a subject that the defendant continually argued with United Airlines, the IRS, the leaders of his various mail-order churches, and even with a United States Senator and a Congressman. There was nothing confidential about Dubé's tax views.

The defendant's other arguments can be quickly dismissed. Dubé argues that Ciociola never knew that a clergy-penitent privilege existed, and that the government therefore was able to take advantage of Ciociola, causing Ciociola to violate the privilege. This argument is groundless as there was nothing in Dubé and Ciociola's tax conversations which the privilege could

protect. Defendant argues that he and Ciociola also discussed intimate moral and spiritual matters. We do not know whether that is true or not because Ciociola was not asked to testify as to anything of that nature. The defendant also argues that Ciociola's testimony was erroneously admitted to show the willfulness of defendant's tax maneuvers. There was evidence enough of willfulness without any of Ciociola's testimony, but, in any event, the tax debates between Ciociola and the defendant do not amount to disclosure to a spiritual counselor in absolute confidence about what are believed to be "flawed acts or thoughts" for the purpose of receiving the benefit of "priestly consolation and guidance" in return. *Trammel*, 445 U.S. at 51, 100 S.Ct. at 913.

The defendant persistently sought someone to tell him he was tax exempt, but he could find no one who would do so except his mail-order churches, a number of whose leaders and members also went to the penitentiary. If by merely joining one of the tax churches a person could avoid all taxes and yet have the full use of his earned income, there would likely be an overnight overabundance of mail-order bishops. That sudden proliferation of bishops, however, would hardly indicate a great religious revival in this country.

### B.  Civil Revenue Ruling

■ Over defendant's objection an IRS witness testified about a 1981 tax court case, *McGahen v. Commissioner*, 76 T.C. 468 (1981), which was admitted into evidence. *McGahen* disposed of the same Basic Bible Church contentions here raised by the defendant. There was, however, no showing that the defendant was actually aware of the holding in the case. The case was admitted for the limited purpose of showing that specific, reliable tax information was available to the defendant, in order to rebut the defendant's claim that the tax questions he raised with ministers, congressmen, and others had no definitive answers. The defendant was relying on a defense of "good faith misunderstanding" of the law, but the jury was instructed that

it could consider whether the defendant intentionally avoided discovering what he did not want to learn about being required to pay his taxes. The information the defendant did not want to have about his tax liabilities was easily available to him whether he chose to acknowledge it or not.

*McGahen* was a civil case. It contained no finding of "guilt" in like circumstances, but it revealed what should have been abundantly clear even without the decision. The Basic Bible Church was nothing more than a tax protest church. Some members of the Basic Bible Church were indicted in 1981. The defendant knew about that and moved to another church, but he showed his willfulness by continuing to violate the tax laws even though he could have, and should have, known better.

We do not see the *McGahen* decision as making much difference one way or the other in view of all the other evidence. Although the decision had been admitted for a limited purpose over the defendant's objection, the defendant sought no limiting instruction. We find no prejudice and no error in its admission in these particular circumstances.

### C. Instructions

In light of the evidence presented, there was little question about what the defendant had or had not done about his taxes. The pivotal issue was Dubé's willfulness. He claims error on the grounds that the jury was not permitted to consider his misunderstanding defense under an "objectively reasonable standard," and that a "strict" instruction was erroneously given.

The defendant submitted his own intent instruction which would have placed on the government the burden of proving that the defendant acted with a "bad purpose" to disobey or disregard the law. The defendant claims that in *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976), the Supreme Court adopted the subjective standard in determining willfulness in tax prosecutions, that is, the defendant should be found not guilty if he actually believed in his erroneous belief. We have already read *Pomponio* differently in *United States v. Koliboski*, 732 F.2d 1328, 1329 n. 1 (7th Cir.1984). In capital letters we declared that "WAGES ARE INCOME" and warned would-be tax protestors that no "good faith" belief otherwise would change the law. We recently reiterated the position in *United States v. Ferguson*, 793 F.2d 828, 831 (7th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 406, 93 L.Ed.2d 358 (1986). Even if the law were as defendant argues his guilt nevertheless was plain. What the tax laws required of defendant was simple, plain, and known to him, but he chose to pretend otherwise while living well in "poverty."

The government submitted separate instructions on intent, good faith, misunderstanding, and knowledge. As to misunderstanding the government proposed an instruction that "a good faith misunderstanding of the law based on reasonable grounds may negate willfulness." This instruction has been approved in this circuit. *United States v. Bressler*, 772 F.2d 287, 291 (7th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986). In an effort to satisfy both parties, the trial judge prepared his own instruction on willfulness, expressing his view that this circuit would move away from an objective standard and use reasonableness merely as one factor in determining subjective good faith. That may come to pass,[10] but there is no need to reconsider the current rule in this case because the trial judge gave his own instruction rather than this circuit's standard instruction. The defendant, however, even under the more favorable instruction that the trial court gave, allowing the jury to consider Dubé's honest beliefs, was not able to prevail with the jury. He therefore has no meritorious complaint in that regard.

---

**10.** The Seventh Circuit, as of March, 1987, had not yet moved away from the objective standard: "A bona fide misunderstanding of the duty to file ... might be framed as a 'mistake of law' defense which, according to this Court, succeeds or fails on the standard of objective reasonableness." *United States v. Sato*, 814 F.2d 449, 451 (7th Cir.1987).

The court gave the government's "ostrich" instruction relating to intentional avoidance. Although the defendant objected to the instruction, and raises the objection on appeal, Dubé's complaint is to no avail. The circuit has approved the instruction as given, although it has been suggested that the instruction could and should be improved. *United States v. Ramsey*, 785 F.2d 184, 189–91 (7th Cir.) (collecting cases in this and other circuits and criticizing wording of instruction), *cert. denied,* —— U.S. ——, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985).

We find no reversible error.

AFFIRMED.