## In re GRAND JURY INVESTIGATION.

### Appeal of UNITED STATES of America.

### No. 89–3817.

United States Court of Appeals, Third Circuit.

Argued June 1, 1990.

Decided Oct. 29, 1990.

Thomas W. Corbett, Jr., U.S. Atty., Bonnie R. Schlueter, Pittsburgh, Pa., James P. Turner, Acting Asst. Atty. Gen., John R. Dunne, Asst. Atty. Gen., David K. Flynn, Lisa Stark (argued), U.S. Dept. of Justice, Washington, D.C., for U.S. of America, appellant.

David H. Dille, Pietragallo, Bosick & Gordon, Pittsburgh, Pa., Eugene R. Scheiman (argued), Jane W. Arnone, Baer Marks & Upham, New York City, for Reverend Ernest Knoche, appellee.

Before BECKER, HUTCHINSON and GARTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by the government, pursuant to 18 U.S.C. § 3731, from an order denying its motion to compel the federal grand jury testimony of a Lutheran clergyman concerning subjects discussed during a family counseling session. The district court held that a clergy-communicant privilege, existing under federal common law, barred the testimony. The grand jury was investigating whether racially motivated housing discrimination and a conspiracy to deny civil rights led to an apparent arson at the home of a black family that lived next door to the family whose members the pastor counseled. In addition to the pastor, the family counseling session involved four persons: a husband and wife, who were members of the pastor's church, the wife's adult son from a previous marriage, and the son's fiancee.

The district court, ruling on the pastor's motion to quash the subpoena compelling him to testify before the grand jury, held that a communication, to be protected, must be made in confidence. It found, however, that the communications of family group members to the pastor were, as the pastor understood them to be, confidential. Otherwise, the court concluded, "his ministry would be ineffective." The government contends that even if a clergy-communicant privilege exists under federal common law, the pastor should not be able to invoke it to avoid testifying about what was said to him in the course of this counseling session.[1] The government reasons

---

1. Apparently for tactical reasons, the government chose not to brief the question whether the federal law of evidence recognizes the clergy-communicant privilege. It instead asked us to assume the existence of the privilege and to decide only its scope. The government persist-

that the presence at the counseling session of the fiancee (not yet a member of the family) was neither essential to nor in furtherance of any religiously motivated communications to the pastor on the part of the others present and therefore worked either to vitiate or to waive any privilege. In support of this argument, the government invokes the general principle that evidentiary privileges, which retard the search for truth, should be narrowly construed.

There is a relative dearth of federal precedent establishing the existence and contours of a clergy-communicant privilege.[2] Although the original draft of the Federal Rules of Evidence included a section providing for a number of specific privileges, including one that would have protected communications to members of the clergy, *see* Proposed Rules of Evidence for the United States Court and Magistrates, 56 F.R.D. 183 (1973), Congress chose not to codify the draft Rules comprehending specific privileges. *See* H.R. 93–650, S.R. 93–1277, H.R. Conf. R. 93–1597, 93rd Cong. 2d Sess. 4, *reprinted* in 1974 U.S.Code Cong. & Admin.News 7051, 7075, 7098, 7100. Congress substituted in their stead a single rule generally providing that "privilege[s] ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.[3] In accordance with this standard, we must determine whether a clergy-communicant privilege in fact exists and, if it does, its relevant contours.

For the reasons that follow, we hold that a clergy-communicant privilege does exist. We further hold that this privilege protects communications to a member of the clergy, in his or her spiritual or professional capacity, by persons who seek spiritual counseling and who reasonably expect that their words will be kept in confidence. As is the case with the attorney-client privilege, the presence of third parties, if essential to and in furtherance of the communication, does not vitiate the clergy-communicant privilege. Neither the record nor the district court's findings, however, are sufficient to establish whether any of those present at the counseling session should be considered third parties, to gauge the impact of any third party's presence, and to enable us to ascertain whether the privilege was properly invoked in this case. We will therefore vacate the district court's order and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

On November 28, 1985, a fire occurred at a house, located in an all-white neighborhood in the Forest Hills section of Pittsburgh, Pennsylvania, that had recently been purchased by a black family. The police and fire departments determined that the fire was the likely result of arson. Within several days of the fire, Mr. and Mrs. George Kampich, Mrs. Kampich's adult son, George Shaw (who is not related legally or by blood to Mr. Kampich), and Patty DiLucente, Shaw's fiancee, sought counseling from the Reverend Ernest Knoche ("Pastor Knoche"), a Lutheran clergyman.[4] All four persons lived in the

---

ed in that position even after the Court indicated an interest in the threshold question. We nevertheless think that it is necessary to reach the threshold issue of the privilege's existence in order rationally to discuss its scope.

**2.** The privilege has variously been referred to as the priest-penitent, clergymen-penitent, communications to clergymen, and clergy-communicant privilege. We adopt the latter nomenclature.

**3.** Rule 501, which became effective June 1, 1975, did not change the law of privilege in federal criminal cases. Prior to the adoption of Rule 501, privileges in criminal cases were gov-

erned by Rule 26 of the Federal Rules of Criminal Procedure, which formerly provided:

"The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

*Mullen v. United States*, 263 F.2d 275, 278 (D.C. Cir.1958) (quoting original text of Rule as adopted in 1948).

**4.** Pastor Knoche actually had three discussions regarding the November 29, 1985 incident. Only Mr. and Mrs. Kampich were present dur-

home next door to the site of the fire. Mr. and Mrs. Kampich are members of Pastor Knoche's church. Although Shaw has occasionally attended services at the church, Shaw and DiLucente are not members. In June of 1989, Shaw and DiLucente were married. In November of 1989, some four years after the counseling session, a grand jury convened by the district court for the Western District of Pennsylvania commenced an investigation of the suspected arson. The grand jury was investigating, in particular, possible violations of 42 U.S.C. § 3631, prohibiting racially motivated housing discrimination, and of 18 U.S.C. § 241, prohibiting conspiracies to violate civil rights.

On November 28, 1989, the government subpoenaed Pastor Knoche to testify before the grand jury about the 1985 counseling session. The government, in support of this subpoena, asserted that it had reason to believe that the Kampiches, Shaw, and DiLucente had planned or participated in the arson and had discussed their involvement with the pastor. In an interview prior to his appearance before the grand jury, Pastor Knoche informed the government that he intended to assert the clergy-communicant privilege and would refuse to answer any questions regarding the counseling session. That day, the government filed a motion in the district court to compel Pastor Knoche to testify before the grand jury.

On November 28th and 29th, the district court held a hearing on the government's motion. In the course of this hearing, the district judge questioned the pastor about the extent of his family and group counseling, the parties involved in the discussion at issue, and the confidentiality of their communications. Pastor Knoche stated that family counseling, in contrast to individual counseling, constituted a typical and important part of his ministry. The Pastor also concurred with the district court's characterization of his ministry as founded upon the Judeo–Christian notion of redemption and forgiveness through counseling and prayer. The Pastor responded, further, that forthrightness and truthfulness on the part of participants, such as Mr. and Mrs. Kampich, Shaw, and DiLucente, are essential to proper counseling and, ultimately, to redemption. He concluded that those whom he spiritually counsels expect that he will keep any communications made to him in strict confidence.

The district court sustained Pastor Knoche's right to assert a clergy-communicant privilege and denied the government's motion to compel his testimony. The district judge, in a colloquy setting forth the basis for his decision, described it as "tough," but concluded that compelling the pastor to testify would break down church-state divisions, infringe upon the right to participate in religious activities, invade a "sacrosanct" area, and, through depriving families of confidential religious counseling, endanger them. This appeal followed.

## II. THE EXISTENCE AND CONTOURS OF A CLERGY–COMMUNICANT PRIVILEGE

In federal courts, evidentiary privileges are governed by Rule 501 of the Federal Rules of Evidence. This provision, which was the product of congressional involvement in the rulemaking process, does not contain a specific and exclusive list of privileges recognized in the federal courts. The Rule instead provides the federal courts with flexibility in crafting testimonial privileges.[5] Rule 501 in pertinent part provides:

Except as otherwise required by the Constitution of the United States or provided

---

ing the first discussion. The district court held that this first discussion was privileged, and the United States does not challenge that portion of the district court's order on appeal. The government does take issue with the court's denial of its petition to compel Pastor Knoche's testimony concerning the counseling session at which Mr. and Mrs. Kampich, Shaw, and DiLucente all were present. The third discussion, involving Pastor Knoche and the same four individuals, took place in the presence of a police officer. Pastor Knoche does not claim a privilege as to that discussion.

**5.** The report of the House Committee on the Judiciary stated:

[Congress] through a single Rule, 501, left the law of privileges in its present state and further provided that privileges shall continue to be developed by the courts of the United

by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, privilege of a witness, person, government, State or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

The Rule dictates the evolution and application of a federal common law of privilege in federal criminal cases.[6] Under Federal Rule of Evidence 1101, Rule 501 is applicable to grand jury proceedings. *See* Fed.R. Evid. 1101(d)(2) (providing that all rules of evidence shall be inapplicable in grand jury proceedings except for that with respect to privileges).

### A. *The Clergy–Communicant Privilege and the History of Rule 501*

The privilege formula adopted by Congress in Rule 501 had its origin in Rule 26 of the Federal Rules of Criminal Procedure.[7] Both the history and the language of Rule 501, therefore, provide us with a

mandate to develop evidentiary privileges in accordance with common law principles. This mandate, in turn, requires us to examine federal and state case law and impels us to consult treatises and commentaries on the law of evidence that elucidate the development of the common law. We believe that the proposed rules of evidence adopted by the Supreme Court and submitted to Congress provide us with an appropriate starting point for discerning the existence and scope of the clergy-communicant privilege.

Rule 501 replaced a number of proposed rules concerning evidentiary privileges that were adopted by the Supreme Court following extensive study and analysis by the Advisory Committee responsible for codifying federal rules of evidence. As submitted to Congress, Article V of the proposed rules set out thirteen rules encompassing nine specific privileges, including a privilege for communications to clergymen. *See* Proposed Federal Rules of Evidence, 56 F.R.D. at 183.[8] Rule 506, delineating the contours of the clergy-communicant privilege, reads as follows:

> States under a uniform standard.... That standard, derived from Rule 26 of the Federal Rules of Criminal Procedure, mandates the application of the principles of the common law as interpreted by the courts of the United States in the light of reason and experience. H.R.Rep. No. 93–650, 93rd Cong., 2d Sess. 4, *reprinted* in 1974 U.S.Code Cong. and Admin. News at 7082.

**6.** In contrast, Rule 501, as it applies to federal civil cases, incorporates the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and requires deference to any applicable state law governing privileges. *See* Fed.R.Evid. 501 (providing that privileges are to be determined in accordance with state law "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision"). Judge Weinstein and Professor Berger, assessing whether and when state law governing privileges applies under Rule 501, state that the Rule always prescribes the application of federal privilege law in federal criminal cases. They continue:

> The far simpler formula that in diversity cases state law applies and in federal question cases federal law applies, was apparently rejected because it does not completely comport with the *Erie* test which Congress was seeking to incorporate. Theoretically, therefore, a state

> privilege may control in a federal question case.
> J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 501[02] (1987).

**7.** The language of Rule 501 echoes the original language of Rule 26. *See Mullen*, 263 F.2d at 278 and *supra* note 2 (quoting former language of Rule 26). Both rules find their origins in a portion of the Supreme Court's opinion in *Wolfe v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934). *See* Fed.R.Crim.P. 26 advisory committee's note; Fed.R.Evid. 501 advisory committee's note. In *Wolfe*, a case concerning the scope of the marital communications privilege, the Court held that the competence of witnesses in federal criminal trials is governed by "common-law principles as interpreted and applied by the federal courts in the light of reason and experience." *Wolfe*, 291 U.S. at 12, 54 S.Ct. at 279; *see also In re Verplank*, 329 F.Supp. 433 (C.D.Cal.1971) (quoting *Wolfe* and quashing subpoena for clergyman to testify before a grand jury on the basis of a common law clergy-communicant privilege).

**8.** The nine specific privileges comprised a privilege protecting required reports privileged pursuant to other statutes; an attorney-client privilege; a psychotherapist privilege; a husband-wife privilege; a privilege covering communications to the clergy; and privileges protecting political votes, trade secrets, the identity of an

Communications to Clergymen

(a) *Definitions.* As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) *General rule of privilege.* A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.

(c) *Who may claim the privilege.* The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority so to do is presumed in the absence of evidence to the contrary.

Proposed Fed.R.Evid. 506, 56 F.R.D. at 247.

The Advisory Committee's note confirms that proposed Rule 506 is expansive in character:

The definition of "confidential" communication is consistent with the use of the term in Rule 503(a)(5) for lawyer-client and in Rule 504(a)(3) for psychotherapist-patient, suitably adapted to communications to clergymen.

. . . .

... *The choice between a privilege narrowly restricted to doctrinally required confessions and a privilege broadly applicable to all confidential communications with a clergyman in his professional character as a spiritual adviser has been exercised in favor of the latter.* Many clergymen now receive training in marriage counseling and the handling of personality problems. Matters of this kind fall readily into the realm of the spirit. The same considerations which underlie the psychotherapist-patient privilege of Rule 504 suggest a broad application of the privilege for communications to clergymen.

*Id.* at 248 (subdivisions (a) & (b)) (emphasis added).

The reference in the Advisory Committee's Note to the group counseling practices common to the psychotherapist-patient relationship and the relationship of lawyers to multiple clients indicates that the Supreme Court did not view the privilege as limited solely to confidential relationships between two individuals. Given the requisite showing of confidentiality, proposed Rule 506 would have extended the clergy-communicant privilege to group discussions.

■ Although Congress chose not to adopt the proposed rules on privileges, it did not disapprove them. The Senate Judiciary Committee's report on Rule 501 states:

It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of ... any ... of the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis.

S.Rep. No. 93–1277, 93rd Cong., 2d Sess. 4, *reprinted* in 1974 U.S.Code Cong. and Admin.News 7051, 7059. We believe that the proposed rules provide a useful reference point and offer guidance in defining the existence and scope of evidentiary privileges in the federal courts. We agree with Judge Weinstein and Professor Berger, who state:

[I]n many instances, the proposed rules, [used as] [s]tandards, remain a convenient and useful starting point for examining questions of privilege. The [s]tan-

informer, and secrets of state and other official information. In addition to the nine rules establishing these privileges, Article V contained four additional rules concerning, *inter alia,* the

waiver of privileges, privileged information disclosed under compulsion, and the impermissibility of comments upon or inferences from a claim of privilege.

dards are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians.... Finally, they were adopted by the Supreme Court....

....

... [T]he Advisory Committee in drafting the Standards was for the most part restating the law currently applied in the federal courts.

J. Weinstein & M. Berger, *supra,* at ¶ 501[03].

The history of the proposed Rules of Evidence reflects that the clergy-communicant rule was one of the least controversial of the enumerated privileges, merely defining a long-recognized principle of American law. Although most of the nine privileges set forth in the proposed rules were vigorously attacked in Congress, the privilege

covering communications to members of the clergy was not. S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 333 (4th ed. 1986).[9] Indeed, virtually every state has recognized some form of clergy-communicant privilege.[10] The inclusion of the clergy-communicant privilege in the proposed rules, taken together with its uncontroversial nature, strongly suggests that the privilege is, in the words of the Supreme Court "indelibly ensconced" in the American common law. *United States v. Gillock,* 445 U.S. 360, 368, 100 S.Ct. at 1191 (1980).

B. *Federal Judicial Precedents Recognizing a Clergy–Communicant Privilege*

The first reported federal case recognizing the clergy-communicant privilege

---

**9.** The lawyer-client privilege (proposed Rule 503) and the political vote privilege (proposed Rule 506) also received little criticism. *See id.* The communications to clergy privilege, like these two other privileges, sharply contrasts with the evidentiary privilege critiqued by the Supreme Court in *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). Refusing to construct a privilege barring the introduction of evidence of legislative acts in federal criminal prosecutions against state legislators, the Supreme Court opined:

> Neither the Advisory Committee, the Judicial Conference, nor this Court saw fit, however, to provide the privilege sought by [the respondent]. Although that fact standing alone would not compel the federal courts to refuse to recognize a privilege omitted from the proposal, it does suggest that the claimed privilege was not thought to be either indelibly ensconced in our common law or an imperative of federalism.

*Id.* at 367–68, 100 S.Ct. at 1190–91 (footnote omitted).

**10.** State statutes providing for a clergy-communicant evidentiary privilege include: Ala.Code § 12–21–166 (1989); Ariz.Rev.Stat.Ann. § 12–2233 (1989); Ark.Stat.Ann. § 16–41–101 (1987 & Supp.1990) (Rule 505); Cal.Evid.Code §§ 1030–34 (Deering 1990); Colo.Rev.Stat. § 13–90–107(1)(c) (1990); Fla.Stat. § 90.505 (1989); Ga.Code Ann. § 24–9–22 (Michie 1989); Haw.Rev.Stat. § 624–45 (1988 & Supp.1989) (Rule 506); Idaho Code § 9–203 (1990); Ill.Rev. Stat. ch. 110, ¶ 8–803 (1988); Ind.Code Ann. § 34–1–14–5 (Burns 1989); Kan.Stat.Ann. § 60–429 (1988); Ky.Rev.Stat.Ann. § 421.210 (Michie/Bobbs–Merrill 1989); La.Rev.Stat.Ann. § 15:477 (1989); Md.Cts. & Jud.Proc.Code Ann. § 9–111 (1989); Mich.Comp.Laws § 767.5a(2)

(1990); Minn.Stat. § 595.02 (1989); Mo.Rev. Stat. § 491.060 (1989); Mont.Code Ann. § 26–1–804 (1989); Neb.Rev.Stat. § 27–506 (1943 & Supp.1989); Nev.Rev.Stat.Ann. § 49.255 (Michie 1971 & Supp.1989); N.H.Rev.Stat.Ann. § 516:35 (1989); N.J.Rev.Stat. § 2A:84A–23 (1987); N.Y.Civ.Prac.L. & R. § 4505 (Consol. 1990); N.C.Gen.Stat. § 8–53.2 (1990); Ohio Rev. Code Ann. § 2317.02 (Baldwin 1990); Okla.Stat. tit. 12, § 2505 (1989); Or.Rev.Stat. § 40.260 (1989); 42 Pa.Cons.Stat. § 5943 (1988); R.I.Gen. Laws § 9–17–23 (1989); S.D. Codified Laws Ann. §§ 19–13–16—19–13–18 (1990); Tenn.Code Ann. § 24–1–206 (1990); Utah Code Ann. § 78–24–8 (1990); Vt.Stat.Ann. tit. 12, § 1607 (1990); Va.Code Ann. § 19.2–271.3 (1990); Wash.Rev.Code § 5.60.060 (1989); W.Va.Code § 57–3–9 (1990); Wis.Stat. § 905.06 (1987–88); Wyo.Stat. § 1–12–101 (1989).

We note that, although the clergy-communicant privilege is part of the American tradition, it did not exist as part of the English common law. *See 8 Wigmore on Evidence* § 2394 (McNaughton rev. ed. 1961) [hereinafter *Wigmore* ]; Proposed Fed.R.Evid. 506 advisory committee's note, 56 F.R.D. at 247. The climate of hostility in England toward the Roman Catholic Church during the Reformation largely accounts for the nonexistence of the privilege at common law. *See* Mitchell, *Must Clergy Tell? Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion,* 71 Minn.L.Rev. 723, 736 (1987). There is evidence to suggest, however, that as a matter of judicial discretion judges would often excuse members of the clergy from testifying about confidential communications. *See* Note, *Texas' Clergymen– Penitent Privilege and The Duty to Report Suspected Child Abuse,* 38 Baylor L.Rev. 231, 233 (1986).

through the common law process of decision was decided in 1958, *see Mullen v. United States,* 263 F.2d 275 (D.C.Cir.1958) (Fahy J., concurring). Judge Fahy's lengthy concurrence in this case traced the history and contours of the clergy-communicant privilege and opined that the admission of a minister's testimony about a conversation, in which the defendant sought spiritual counseling, constituted an additional ground for overturning the jury's verdict against her.

Following *Mullen,* a number of federal courts recognized a common law clergy-communicant privilege. The court in *In re Verplank,* 329 F.Supp. 433, 435 (C.D.Cal. 1971), for example, invoked the *Mullen* concurrence and the Supreme Court's instruction in *Wolfe* that the federal courts should develop evidentiary rules "in the light of reason and experience." The court held that draft counseling services rendered by a clergyman came within the ambit of his religious duties and were privileged. *Id.* at 436. The court further concluded that the privilege extended to counseling by members of the clergyman's staff who were not ordained ministers. *Id.* In *United States v. Wells,* 446 F.2d 2 (2d Cir.1971), the court, holding that the admission into evidence of a letter from the defendant to a priest did not violate the clergy-communicant privilege, implicitly recognized such a privilege. The *Wells* court based its holding on the absence of any indication that the defendant had intended the letter to be confidential or that "its purpose was to obtain religious or other counsel, advice, solace, absolution or ministration." *Id.* at 4.[11]

The Supreme Court, albeit in dicta, subsequently acknowledged the existence of a "priest-penitent" privilege. *See Trammel v. United States,* 445 U.S. 40, 45, 100 S.Ct. 906, 909–10, 63 L.Ed.2d 186 (1980). The

*Trammel* Court, pursuant to Rule 501's mandate to the federal courts to develop common law rules of privilege in a flexible manner, held that the rule precluding the adverse testimony of one spouse against the other, with respect to non-confidential communications, may only be invoked by the witness-spouse. Critiquing an archaic and unduly expansive rule that permitted a defendant to exclude from evidence any adverse spousal testimony, the Court favorably referred to several privileges by analogy, among them, the "priest-penitent" privilege:

> The privileges between priest and penitent, attorney and client, and physician and patient limit protection to private communications. The privileges are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.

Id. at 51, 100 S.Ct. at 913. *See also United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) ("[G]enerally, an attorney or *a priest* may not be required to disclose what has been revealed in professional confidence." (emphasis added)).

In the wake of the Supreme Court's opinion in *Trammel,* a number of federal district courts and courts of appeal have also acknowledged the clergy-communicant privilege. *See, e.g., United States v. Dube,* 820 F.2d 886 (7th Cir.1987) (acknowledging existence of clergy-penitent privilege, but holding that privilege did not apply to communications made to clergyman to obtain assistance in avoiding tax obligations, not spiritual relief); *United States v. Gordon,*

---

11. Other federal cases at least impliedly recognizing the clergy-communicant privilege and decided within the same time period include *United States v. Luther,* 481 F.2d 429 (9th Cir.1973) (impliedly recognizing penitent-clergyman privilege in holding that the privilege could not be invoked to protect religious corporation's financial records from inspection by the Internal Revenue Service); *In re Wood,* 430 F.Supp. 41

(S.D.N.Y.1977) (impliedly recognizing possibility that evidentiary privilege might protect communications made in course of "priest-penitent relationship" not at issue in the case); *Cimijotti v. Paulsen,* 219 F.Supp. 621 (N.D. Iowa 1963) (holding, in diversity case, that clergy-penitent privilege exists and protects communications within its ambit from disclosure in deposition taken in the course of discovery).

655 F.2d 478 (2d Cir.1981) (holding that defendant's business communications to priest he employed in a nonreligious capacity were not protected by priest-penitent privilege); *Eckmann v. Board of Education*, 106 F.R.D. 70 (E.D.Mo.1985) (observing that "[t]he 'priest-penitent' privilege has clearly been recognized by federal courts" and holding that Catholic nun could invoke the privilege with respect to communications made to her in her capacity as a spiritual advisor); *but cf. Seidman v. Fishburn–Hudgins Educational Foundation*, 724 F.2d 413 (4th Cir.1984) (holding that relative could not invoke clergyman-communicant privilege on decedent's behalf and observing that privilege "has no firm foundation in common law"); *United States v. Webb*, 615 F.2d 828 (9th Cir.1980) (court found that prisoner's confession to crime in presence of a minister and security officer was not confidential, but did not reach question whether clergy-communicant privilege applies in federal proceedings).

Although we have never formally recognized the clergy-communicant privilege, several of our opinions have referred to the privilege in passing. These opinions note that the privilege protecting communications to members of the clergy, like the attorney-client and physician-patient privileges, is grounded in a policy of preventing disclosures that would tend to inhibit the development of confidential relationships that are socially desirable. *See Government of the Virgin Islands v. Lee*, 775 F.2d 514 (3d Cir.1985) (case involving extent to which speech or debate clause privilege encompasses legislative fact finding); *In re Grand Jury Investigation*, 587 F.2d 589 (3d Cir.1976) (case interpreting scope of the speech and debate clauses of the Constitution and analyzing legislator's standing to assert derivative privilege); *see also In re Grand Jury Matter*, 673 F.2d 688, 695 (3d Cir.) (Sloviter, J., concurring) (noting private benefits of certain privileges, including the "priest-penitent" privilege, in critiquing majority opinion concerning usefruits immunity following the invocation of the privilege against adverse spousal testimony), *cert. denied*, 459 U.S. 1015, 103

S.Ct. 375, 74 L.Ed.2d 509 (1982); *In re Grand Jury Proceedings*, 563 F.2d 577, 587 (3d Cir.1977) (Gibbons, J., concurring) (critiquing federal common-law legislative privilege found to exist by majority and contrasting this privilege to privileges, including "priest-penitent" privilege, that have significant public or private benefits).

### C. The Scope and Contours of the Clergy–Communicant Privilege Adopted

■ We do not take lightly our responsibility to develop common law evidentiary privileges "in the light of reason and experience." Fed.R.Evid. 501; *see Gillock*, 445 U.S. at 367–68, 100 S.Ct. at 1190–91. In developing the federal common law of privileges concerning communications to the clergy, we must attempt to balance the need for full disclosure of all probative evidence against the countervailing requirement of confidentiality that furthers the objectives underlying the privilege claimed. *See In re Grand Jury Impaneled January 21, 1975*, 541 F.2d 373, 382 (3d Cir.1976). Although Rule 501 grants the federal courts power to create new privileges or to develop existing privileges as the need arises, we agree with the government's contention in this case that our authority is narrow in scope and should be exercised only after careful consideration in the face of a strong showing of need for the privilege. *See* Brief for Appellant at 6; *Trammel*, 445 U.S. at 45, 100 S.Ct. at 909–10. Testimonial privileges contravene the well-established principle that " 'the public ... has a right to every man's evidence' " and, therefore, "must be strictly construed and 'accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.' " *Trammel*, 445 U.S. at 46, 100 S.Ct. at 910 (citations omitted); *accord Nixon*, 418 U.S. at 709–10, 94 S.Ct. at 3108–09.

■ In determining whether a clergy-communicant privilege exists, we weigh Dean Wigmore's four fundamental prereq-

uisites for a privilege against the disclosure of communications:

(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

8 *Wigmore* at § 2285 (footnote omitted) (emphasis in original).[12] The Advisory Committee Note to proposed Rule 506 adverts to these considerations and concludes that they "seem strongly to favor a privilege for confidential communications to clergymen." 56 F.R.D. at 247.

 We are, of course, mindful of the broad investigatory powers accorded to the grand jury. We again note, however, that the Rules of Evidence explicitly provide for the application of Rule 501, the more general successor to proposed Rule 506, in grand jury proceedings. *See* Fed.R.Evid. 1101(d)(2). We are satisfied, moreover, that American common law, viewed in the light of reason and experience and the "conditions" properly set forth by Dean Wigmore and by Judge Weinstein, *supra* note 12, compels the recognition of a clergy-communicant privilege. Both state and federal decisions have long recognized the privilege. The Supreme Court Rules Committee also recognized the privilege. That is doubtless because the clergy-communicant relationship is so important, indeed so fundamental to the western tradition, that it must be "sedulously fostered." 8 *Wigmore* at § 2285. Confidence is obviously essential to maintaining the clergy-communicant relationship. Although there are countervailing considerations, we have no doubt that the need for protecting the relationship outweighs them.

 We believe that the privilege should apply to protect communications made (1) to a clergyperson [13] (2) in his or her spiritual and professional capacity (3) with a reasonable expectation of confidentiality. As is the case with the attorney-client privilege, the presence of third parties, if essential to and in furtherance of the communication, should not void the privilege. This statement of the contours of the privilege is consistent with the provisions of Rule 506, which, as our study of the federal case law confirms, tracks the evolving common law. In addition, we note our agreement with the tenor of the Advis-

---

12. In analyzing whether this privilege exists under federal common law, we have also considered the balancing process described by Judge Weinstein in *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976). *King* involved the rather different issue of whether a federal court should recognize a state privilege in the context of a prosecution for a federal crime. We find helpful, nonetheless, the factors considered by Judge Weinstein in the following passage from the case:

> [T]he justifiable "principles of the common law" as they relate to matters of developing new privileges—those not firmly embedded in federal law—require the balancing of four factors: first, the federal government's need for the information being sought in enforcing its substantive and procedural policies; second, the importance of the relationship or policy sought to be furthered by the state rule of privilege and the probability that the privilege will advance that relationship or policy; third, in the particular case, the special need for the information sought to be protected; and fourth, in the particular case, the adverse impact on the local policy that would result from non-recognition of the privilege.

> *Id.* at 105.

13. We believe that Proposed Rule of Evidence 506(a)(1) provides a workable definition of a clergyperson: "A 'clergyman' is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him." 56 F.R.D. at 247. By endorsing this definition of a clergyperson, we do not intimate that the privilege should be interpreted to comprehend communications to and among members of sects that denominate each and every member as clergy, proclaim that all communications have spiritual significance, or dictate that all communications among members, whether essential to and in furtherance of the purportedly privileged communication or not, shall be confidential.

ory Committee's Note to proposed Rule 506, which extends the scope of the privilege to encompass not only communications between Roman Catholic priests and their penitents, but also communications between clergy and communicants of other denominations. *See* Proposed Fed. Rule of Evid. 506 advisory committee's note, 56 F.R.D. at 247.[14]

 Our delineation of the privilege is not comprehensive. We illuminate here and *infra* only those facets and boundaries of the privilege that are implicated in this case. The privilege is a common law rule. The precise scope of the privilege and its additional facets, such as whether a clergyperson should be required to disclose confidential communications when harm to innocent parties is threatened and imminent, are, therefore, most suitably left to case-by-case evolution.[15]

### III. THE APPLICATION OF THE CLERGY–COMMUNICANT PRIVILEGE IN THIS CASE

As we have explained, in order for the clergy-communicant privilege to apply, the communication protected must, at a minimum, be made with a reasonable expectation of confidentiality to a member of the clergy acting in his or her professional or spiritual capacity. In this case, within days of the suspected arson, Pastor Knoche had a group discussion with Mr. and Mrs. Kampich, Shaw, and DiLucente. The government alleges that these persons may have planned or participated in setting the fire at the home of their black neighbor. DiLucente, however, is not a target of the grand jury investigation.

The threshold criterion for deciding whether the privilege should attach—the criterion that the communication be made to a clergyperson—is clearly satisfied. Pastor Knoche is an ordained Lutheran minister. Whether the Kampiches, Shaw, and DiLucente communicated with Pastor Knoche in his spiritual or professional capacity, thus fulfilling the second prerequisite for attachment of the privilege, is less obvious.[16] Whether the Kampiches', Shaw's, and DiLucente's communications to Knoche were made with a reasonable expectation of confidentiality, fulfilling the third prerequisite for the privilege's attachment, is also unclear.

The government, although not conceding the existence of the clergy-communicant privilege, maintains that DiLucente's presence during the Kampiches' and Shaw's conversation with Pastor Knoche undermines the confidentiality of this conversation for two reasons. The government contends, first, that any existing clergy-com-

14. Indeed, the prospect of restricting the privilege to Roman Catholic penitential communications raises serious first amendment concerns. *See Larsen v. Valente*, 456 U.S. 228, 245–46, 102 S.Ct. 1673, 1683–84, 72 L.Ed.2d 33 (1982) (emphasizing that the establishment clause articulates a "principle of denominational neutrality" and holding that state law "granting a denominational preference" is subject to strict scrutiny).

15. We also need not address at any length the question of who may assert the privilege. The authorities recognizing the privilege would allow it to be asserted, as it was here, by a clergyperson on behalf of a communicant. *See, e.g.,* Proposed Fed.R.Evid. 506(c), 56 F.R.D. at 247; 8 *Wigmore* at § 2395; J. Weinstein & M. Berger, *supra,* at ¶ 506[03]; S. Stone & R. Liebman, *Testimonial Privileges* § 6.08 (1983). We need not reach the issue, therefore, of whether Pastor Knoche could assert the privilege on his own behalf.

With respect to the question of which party carries the burden of proof in establishing the privilege's applicability, it is clear, in this Circuit, that a party who asserts a privilege has the burden of proving its existence and applicability. *See In re Bevill, Bressler & Schulman Asset Management Corp.,* 805 F.2d 120, 124 (3d Cir. 1986); *In re Grand Jury Empaneled Feb. 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979). We note, in addition, that the existence and applicability of a privilege may be undermined by the presumption, rebuttable by the party asserting the privilege, that communications that take place in the presence of third parties are not confidential. *E.g. Pereira v. United States,* 347 U.S. 1, 6–7, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1953) ("The presence of third parties negatives the presumption of privacy."). *See also* our discussion *infra.*

16. Cases that have examined with particularity the nature of the communications that fall within the ambit of the clergy-communicant privilege include *Dube,* 820 F.2d at 886; *Gordon,* 655 F.2d at 478; *Eckmann,* 106 F.R.D. at 70.

municant privilege is inapplicable in this case because DiLucente was not related to the Kampiches and Shaw by either blood or marriage at the time the conversation took place. The government further contends that any privilege should be inapplicable because DiLucente's presence during the group discussion was neither essential to nor in furtherance of the purpose of the communication. In essence, the government claims that persons who are not related by blood or by marriage cannot, under federal law, engage together in protected communications with a member of the clergy acting in a spiritual or professional capacity. It is undisputed that DiLucente was related to the Kampiches and Shaw by neither blood nor marriage at the time of the group counseling session as to which the government seeks Pastor Knoche's testimony. We must therefore reach the issue whether the clergy-communicant privilege may apply to pastoral counseling sessions involving persons who have no family ties to one another.

 The government is correct in observing that the traditional clergy-communicant privilege protected a penitential relationship in which a person privately confessed his or her sins to a priest, in order to receive some form of church sanctioned discipline or absolution.[17] Neither family nor other types of group counseling

fit neatly within this "one-to-one" model of the privilege. We have explained, however, that the modern view of the privilege is more expansive than the traditional one. We discern nothing in modern clergy-communicant privilege doctrine, as it finds expression in either proposed Rule 506 or the cases recognizing the privilege, that would limit the privilege's application solely to group discussions involving family members related by blood or marriage.[18] Modern clergy-communicant privilege doctrine focuses, rather, on whether the presence of a third party is essential to or in furtherance of a communication to a member of the clergy. *See* Proposed Fed. Rule of Evid. 506(a)(2), 56 F.R.D. at 247; *Webb*, 615 F.2d at 828; *Wells*, 446 F.2d at 2. We think, consistent with the general constructional rule that evidentiary privileges should be narrowly construed, that recognition of the clergy-communicant privilege in this circumstance depends upon whether the third party's presence is essential to *and* in furtherance of a communication to a member of the clergy.[19] As is the case with consultations between attorneys and clients, the presence of multiple parties, unrelated by blood or marriage, during discussions with a member of the clergy may, but will not necessarily, defeat the condition that communications be made with a reasonable expectation of confidentiality in order for the privilege to attach.[20]

---

17. Wigmore envisioned that the privilege for communications between a member of the clergy and a communicant protected communications made in the course of a one-to-one discussion, pursuant to established "church discipline." 8 *Wigmore* at § 2395. He states:

> In the application of the statutes, it has been held, following the dictates of principle, that the privilege applies only to communications made in the understood pursuance of that church discipline which gives rise to the confessional relation; and, therefore, in particular to confession of sin only, not to communications of other tenor; that it includes only the communications, and not information otherwise acquired; and that it exempts the penitent also, as well as the priest, from disclosure.

*Id.* (footnotes omitted).

18. We therefore reject the government's contention that the district court erred in holding that the privilege obtained in this case because it

based its holding on the current relationship by blood or by marriage between the Kampiches, Shaw, and DiLucente—a relationship that did not exist at the time that the communications at issue were made.

19. Thus, in a situation where numerous persons, each seeking individual spiritual guidance, choose to meet as a group with a clergy member, a privilege does not exist unless, upon independent scrutiny, the "essentiality and in furtherance" test is met.

20. The presence of a third party will not vitiate the attorney-client privilege, if the third party is the attorney's or client's agent or possesses a commonality of interest with the client. *See* 8 Wigmore at § 2311. Similarly, the presence of a third party, may, but will not always, void the clergy-communicant privilege. *See* S. Stone & K. Liebman, *supra,* at § 6.13; Yellin, *History and Current Status of the Clergy–Penitent Privilege,* 42 Santa Clara L.Rev. 95, 150 (1983).

At the district court's hearing on the privilege, the testimony concerning whether the Kampiches, Shaw, and DiLucente reasonably expected that their communications to Pastor Knoche were confidential was sparse. The court did touch upon this issue, as well as the issue of whether the communications were made to the pastor in his spiritual or professional capacity, in the following colloquy:

> [The Court] Would you say as to the second situation where you spoke with the ... husband and wife, as well as the wife's adult son from a previous marriage and the son's fiancee who is now his wife, ... that those communications were in confidence and were confident?
>
> [Pastor Knoche] In my role or capacity as pastor and in confidence.
>
> [The Court] And they were in confidence?
>
> [Pastor Knoche] Yes, your Honor.
>
> [The Court] I'm going to sustain your privilege.

This was the only indication that the district court gave as to whether it considered that the communications to Pastor Knoche were confidential and made to him in his spiritual or professional capacity. The district court neither inquired into whether the presence of each person at the discussion was essential to and in furtherance of the communications to the pastor nor made findings of fact on that issue.

Although the district court was correct in recognizing the existence of a clergy-communicant privilege, we are unable to affirm its order denying the government's motion to compel Pastor Knoche's testimony. That is because, given the contours of the privilege as we have defined it, the court did not develop a sufficient record or make sufficient findings to enable us finally to review its order. In fairness to the district court, we note that the court did not, at the time of its decision, have the benefit of the standards that we announce today. We must nevertheless remand the case for further proceedings.

It is difficult to anticipate the precise anatomy of the proceedings on remand. It is clear that the district court must develop a record and make findings, consistent with the prerequisites for the privilege that we have enumerated, concerning whether the Kampiches, Shaw, and DiLucente communicated with Pastor Knoche in his spiritual or professional capacity and with a reasonable expectation of confidentiality. As we have noted, however, family counseling does not fit neatly within the old common law model of the privilege, which assumed a "one-to-one" relationship between priest and penitent. The three basic inquiries accompanying our three prerequisites for the application of the clergy-communicant privilege, applied in the more complex context of family counseling presented by this case, potentially devolve into a number of further possible inquiries.

In order to determine whether the Kampiches, Shaw, and DiLucente communicated with Pastor Knoche in his spiritual or professional capacity and with a reasonable expectation of confidentiality, for example, the district court may well have to inquire into the nature of the communicants' relationship as well as the pastoral counseling practices of the relevant synod of the Lutheran church.[21] In order to decide, more particularly, whether members of this group reasonably expected that their communications to Pastor Knoche would be kept in confidence, the court may also find it necessary to inquire into whether the parties shared a commonality of interest at the time of the communication and, if so, in what respect. At all events, a fuller record must be developed as to DiLucente's role in the counseling session. In order to ascer-

---

21. Although restricting the clergy-communicant privilege to Roman Catholic penitential communications, for example, would raise serious establishment clause concerns, inquiring into the pastoral counseling practices of a particular denomination would appear to pose no such threat to first amendment rights. Rather, we believe that establishing the pastoral counseling practices of a particular denomination to ascertain the types of communications that the denomination deems spiritual and confidential is both a necessary and a constitutionally inoffensive threshold step in determining whether a privilege interdenominational in nature applies in light of the facts and circumstances of a particular case.

tain whether her presence worked to vitiate or to waive the privilege, the court will have to inquire into whether the other group members, who apparently are subjects of the grand jury investigation, reasonably required her presence at the counseling session, either in furtherance of their communications to the pastor or to protect their interests.[22] We, of course, intimate no view on these matters.

■ Neither do we advance a view as to the precise procedures to be followed on remand. In its attempt to determine DiLucente's role in the group counseling session, however, the district court may feel it necessary to seek some degree of disclosure of what was discussed with the pastor. We have, in other situations in which a privilege was implicated, recommended the use of *in camera* hearings, accompanied by a variety of options with respect to the presence or absence of counsel and the parties. *See generally In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d at 125 n. 2.[23] We note, however, that the determination whether to conduct an *in camera* proceeding, as well as the anatomy of any such proceeding, in

this situation will necessitate consideration of delicate first amendment issues, lest the hearing itself result in evisceration of the privilege. *Cf. United States v. Zolin*, —— U.S. ——, 109 S.Ct. 2619, 2630, 105 L.Ed.2d 469 (1989). *United States v. Reynolds*, 345 U.S. 1, 7–10, 73 S.Ct. 528, 531–33, 97 L.Ed. 727 (1953). The district court should explain its reason for the adoption of any particular procedure employed in evaluating the claim of privilege.

In sum, there are no hard and fast rules in this area. We are confident, however, that through carefully framed inquiries, the district court will be able to obtain sufficient information to determine whether the clergy-communicant privilege should apply in this case.

The order of the district court will be vacated and the case remanded to that court for further proceedings. In view of the possible early expiration of the statute of limitations, the mandate will issue forthwith.

**22.** This inquiry into DiLucente's role in the counseling session might also prove essential to the resolution of a potential issue as to which of the parties present at the session, besides Pastor Knoche, may invoke the privilege. If DiLucente were found to have been present at the counseling session only in furtherance of the Kampiches' and Shaw's communications to the pastor, for example, it is possible that she herself could not invoke the privilege. We have noted, however, that it is Pastor Knoche who has invoked the clergy-communicant privilege, and we assume that he will continue to do so. We have also noted, *supra* at note 15, that there is ample authority to support a clergyperson's invocation of the privilege on behalf of a communicant. Which of the other parties present at the counseling session possesses the power to invoke or to waive the privilege is, therefore, not at issue in this case at present, and we expressly leave that issue open, to be decided on a case-by-case basis.

**23.** Under some circumstances, in order to comport with statutory and constitutional requirements, the presence of counsel at *in camera* hearings may be necessary. *See United States v. Bohn*, 890 F.2d 1079 (9th Cir.1989) (defendant is entitled to have counsel present at an *in camera* proceeding to assess his fifth amendment claim); *In re Grand Jury Matter*, 683 F.2d 66 (3d

Cir.1982) (*ex parte, in camera* presentation by government of evidence concerning alleged illegal wiretap held not to comport with requirements of 18 U.S.C. § 3504); *United States v. Lopez*, 328 F.Supp. 1077 (E.D.N.Y.1971) (if one counsel is present then all counsel must be present at *in camera* hearing on informer's identity). We have also held, however, that a court, in order to preserve or further enhance confidentiality, may under many circumstances conduct *ex parte, in camera* proceedings. *See In re Grand Jury Matter of Catania*, 682 F.2d 61 (3d Cir.1982) (given the secrecy attached to grand jury transcripts and F.B.I. investigation materials, district court's decision to exclude appellant and counsel from *in camera* examination of the materials comported with due process and was not in error); *United States v. Gallagher*, 576 F.2d 1028, 1040 (3d Cir.1978) (*in camera* questioning of witness in the absence of all attorneys was consistent with Jenck's Act and not in error); *United States v. D'Andrea*, 495 F.2d 1170 (3d Cir.), (*ex parte, in camera* proceeding concerning question whether illegal wiretapping had occurred was not complex enough to require, as a matter of law, the safeguards of an adversary proceeding), *cert. denied*, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974).