# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**Misc. Dkt. No. 2020-07**

_____

**UNITED STATES**
*Appellant*

**v.**

**Bryce L. HARRIS**
Staff Sergeant (E-5), U.S. Air Force, *Appellee*

_____

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 16 April 2021[1]

_____

*Military Judge*: Matthew N. McCall.

*GCM convened at*: Joint Base McGuire-Dix-Lakehurst, New Jersey.

*For Appellant:* Major Jessica L. Delaney, USAF (argued); Colonel Shaun
S. Speranza, USAF; Lieutenant Colonel Matthew J. Neil, USAF.

*For Appellee:* Captain David L. Bosner, USAF (argued); Major Amanda
E. Dermady, USAF; Captain Sara J. Hickmon, USAF.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military
Judges*.

Judge MEGINLEY delivered the opinion of the court. Senior Judge
POSCH filed a separate opinion concurring in part and in the result.
Judge RICHARDSON filed a separate dissenting opinion.

_____

**This is an unpublished opinion and, as such, does not serve as
precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

---

[1] The court heard oral argument in this case on 23 February 2021.

MEGINLEY, Judge:

The United States brings this interlocutory appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862, asserting that the military judge abused his discretion in his application of Mil. R. Evid. 503 to exclude evidence of Appellee's communications. The court finds the military judge did not abuse his discretion in excluding the evidence.

## I. BACKGROUND

Appellee is charged with one specification of indecent recording of ER, his former sister-in-law, in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c; and one specification of attempted indecent recording, on divers occasions, of ER, in violation of Article 80, UCMJ, 10 U.S.C. § 880.[2] The convening authority referred the charges to a general court-martial on 6 December 2019. On 3 February 2020 and again on 30 June 2020, pursuant to Mil. R. Evid. 304(d), the Government gave notice to the trial court of its intent to use Appellee's admissions of "attempted and successful recording of [ER]" made during a meeting with the base chaplain, Chaplain (Major) RD.[3] In a motion dated 6 July 2020, the Government specifically moved the trial judge to rule on the admissibility of communications disclosed by Appellee during a February 2015 meeting[4] with Chaplain RD; Appellee's wife, BB;[5] his wife's father, MR, and mother, GR; and BB's sister, ER; where information related to the alleged offenses at issue was disclosed.

On 13 July 2020, the Defense requested the military judge deny the Government's motion based on the communications between Appellee, the base chaplain, and his family members being privileged under Mil. R. Evid. 503.

---

[2] All references in this opinion to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2012 ed.). The charges and specifications were referred to trial after 1 January 2019; as such, all other references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.). *See* Exec. Order 13,825, §§ 3, 5, 83 Fed. Reg. 9889, 9890 (8 Mar. 2018). Specifically, Appellee is charged with attempting to knowingly and wrongfully make a recording of the private area of ER while she was using the shower and while undressing, and wrongfully and knowingly making a recording of the private area of ER while she was using the shower.

[3] Chaplain RD was an active duty chaplain at the time of the February 2015 meeting.

[4] The court notes the initial date of this motion states it was filed on 6 June 2020; however, the motion was served on 6 July 2020. We believe the 6 June 2020 is in error and that the motion was actually filed with the court on 6 July 2020.

[5] Appellee and his wife, BB, were divorced at the time of the hearing.

The military judge received additional evidence and argument by counsel during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session on 2 September 2020, in which the Appellee was arraigned and where Appellee, Chaplain RD, BB, MR, GR, and ER testified about the February 2015 meeting. The testimony revealed that the February 2015 meeting centered on incidents that allegedly occurred in 2012 or 2013, while Appellee and BB were visiting BB's family in Georgia.

During these visits, Appellee allegedly recorded ER in her bedroom and bathroom with his cell phone. ER was around 12 years old at the time. BB did not learn about the filming until 2015, when GR told her about the allegation. According to BB, she confronted Appellee, and although he initially denied recording ER, he later admitted to doing so. In March 2018, after an investigation was opened on Appellee's conduct regarding other allegations, BB reported the incidents in question to authorities.

In his initial written ruling, dated 27 October 2020, the military judge denied the Government's motion. The military judge concluded:

> The language of [Mil. R. Evid.] 503(a) is clear that a person "has a privilege to refuse to disclose and *to prevent another from disclosing* a confidential communication by the person to a clergyman. . . ." (*emphasis added*.) . . . [T]he purpose of the communication required that the family members be present. To then allow the family members to divulge what was only communicated under the auspices of a formal act or as a matter of conscience would gut the protections that the privilege seeks to protect. As such, the family members who were present at the meeting cannot disclose what protected communications [Appellee] made at the meeting.

On 30 October 2020, the Government requested a reconsideration of the military judge's 27 October 2020 ruling. On 8 November 2020, the military judge, in writing, denied the Government's motion for reconsideration. On 10 November 2020, the Government gave the military judge notice of its Article 62, UCMJ, appeal. In his written rulings, the military judge made findings of fact that are largely supported by the record. Unless otherwise noted in this opinion, we adopt those findings of fact.

The communications at issue before this court are from the February 2015 meeting. At the time of this meeting, Appellee and BB were having marital problems. BB believed Appellee had surreptitiously recorded her younger sister, ER, without her sister's knowledge. GR asked BB if there was a possibility that they could get a third party involved and mediate so the family could "get it out in the open and move on." GR, MR, BB, and ER all believed Appellee had

made recordings of ER using his cell phone. GR suggested "the meeting in the hope that the family members could resolve their internal conflict, heal, and move on with their lives."

BB was receptive to the idea of a family meeting and contacted Chaplain RD.[6] BB had met with Chaplain RD individually on multiple occasions, and Chaplain RD had also met Appellee and BB as a couple for counseling. BB told Chaplain RD about the allegations before the family meeting. BB considered other forms of counseling, but decided to go see Chaplain RD because she had met Chaplain RD on multiple occasions and because BB "wanted a religious perspective." BB testified that Appellee would only talk to a clergy member because he did not trust therapists or counselors. Appellee was willing to meet with the familial group and a chaplain, which was for spiritual reasons, as well as trust in the chaplain.

When Chaplain RD began the February 2015 family session, she explained their purpose in being there—something she knew from a discussion with BB prior to the session. During the meeting, ER confronted Appellee about allegations that he had recorded ER with his cell phone. Appellee allegedly responded to the allegations, making admissions when he did so. Although his communications were directed towards everyone, he looked primarily at ER and the chaplain when he spoke. At some point, Chaplain RD said a prayer and passed out religious material to the family.

Chaplain RD believed sessions like this one were confidential and privileged whether or not multiple people were present. Chaplain RD also believed that Appellee, his wife, his wife's parents, and ER considered the meeting privileged and confidential because they met in her official capacity as a chaplain. However, at no point during the meeting did Chaplain RD relate to the others that she considered communications to be confidential.

Appellee testified for the limited purpose of the motion, explaining he was raised in a Christian household, attended a Christian high school, went to church regularly, and prayed on a daily basis. Appellee testified he believed

---

[6] The military judge's finding of fact that GR suggested the entire family specifically meet with the *base chaplain* is not supported by the record. GR asked BB if there was a possibility that they could get a third party involved and mediate so the family could discuss what happened and "move on."

the meeting was confidential because it was at the chapel and with the chaplain. He went to the meeting with Chaplain RD for "religious purposes."[7] Appellee stated he and his wife had a lot of problems and his goal was for the family to get past the issues, to get his relationship with BB back on track, and to save his marriage.

## II. DISCUSSION

### A. Law

#### 1. Article 62, UCMJ, Jurisdiction

We have jurisdiction to hear an appeal under Article 62(a)(1)(B), UCMJ, 10 U.S.C. § 862(a)(1)(B), which authorizes the Government to appeal "[a]n order or ruling which excludes evidence that is substantial proof of a fact material in [a court-martial] proceeding" where a punitive discharge may be adjudged. Appellee has not contested this court's jurisdiction, and the pleading and the record convince us that Appellee's statements during the February 2015 meeting with the chaplain are case dispositive as they are substantial proof of a fact material in the proceeding. *See United States v. Pacheco*, 36 M.J. 530, 533 (C.M.R. 1992).[8]

#### 2. Standard of Review

We review a military judge's decision to exclude evidence for an abuse of discretion. *United States v. McCollum¸* 58 M.J. 323, 335 (C.A.A.F. 2003) (citing *United States v. McElhaney*, 54 M.J. 120, 132 (C.A.A.F. 2000)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted).

---

[7] Clarifying this finding of fact by the military judge, when asked, "[W]hy was it important to you to make statements only to the Chaplain in February of 2015?" Appellee responded, "For religious purposes." Also, Appellee agreed to go to the meeting, set up by BB. Finally, Appellee stated he went to the meeting to discuss some of his marital problems with BB, along with "entanglement[s]" between his in-laws.

[8] In the National Defense Authorization Act for Fiscal Year 2017, Congress added a liberal construction clause to Article 62, UCMJ, identical to 18 U.S.C. § 3731. Pub. L. No. 114-328, § 5326, 130 Stat. 2000, 2929 (2016), and effective 1 Jan 2019, in which Article 62 was amended to read: "(e) The provisions of this article shall be liberally construed to effect its purposes." Because this amendment was in effect before Appellee's case was referred, the amendment applies to this appeal. See *United States v. Jacobsen*, 77 M.J. 81, 87 n.5 (C.A.A.F. 2017).

"We review de novo matters of law in an Article 62, UCMJ, appeal." *United States v. Knell*, Misc. Dkt. No. 2010-08, 2010 CCA LEXIS 301, \*4 (A.F. Ct. Crim. App. 30 Jun. 2010) (order) (citing *United States v. Terry,* 66 M.J. 514, 517 (A.F. Ct. Crim. App. 2008)). Because this issue is before us pursuant to a government appeal, we may act only with respect to matters of law. Article 62(b), UCMJ. We may not make findings of fact; on questions of fact, we are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are 'fairly supported by the record.'" *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004) (quoting *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)). "On questions of fact, [we ask] whether the decision is *reasonable*; on questions of law, [we ask] whether the decision is *correct*." *United States v. Baldwin,* 54 M.J. 551, 553 *(*A.F. Ct. Crim. App. 2000*)* (alterations in original) (quoting 2 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 7.05 (3d ed. 1999)), *aff'd*, 54 M.J. 464 (C.A.A.F. 2001).

"In an Article 62, UCMJ, appeal, this court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the party which prevailed at trial," which in this case is Appellee. *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019) (*citing United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017)).

### 3. Mil. R. Evid. 503, *Communications to clergy*

The question of whether a communication is privileged is a mixed question of fact and law. *United States v. Harpole*, 77 M.J. 231, 235 (C.A.A.F. 2018) (citing *United States v. Shelton,* 64 M.J. 32, 37 (C.A.A.F. 2006)); *see also McCollum,* 58 M.J. at 340. "Recognizing that the distinction between a question of law and a question of fact is not always clearly defined, we must nevertheless avoid resolving questions of fact which are separable from a question of law." *United States v. Piolunek*, 74 M.J. 107, 110 (C.A.A.F. 2015) (citations omitted). "[Q]uestions of credibility, or assertions that the factual basis for a ruling should be reinterpreted are not reviewable by the Court." *Id*. (citations omitted).

"Military law is not insensitive to the needs of servicemembers for chaplains and spiritual guidance, and it has long recognized the 'penitent and clergyman' privilege." *United States v. Coleman*, 26 M.J. 407, 409 (C.M.A. 1988) (citations omitted). "The Supreme Court has said the 'privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly

consolation and guidance in return.'" *Id.* at 410 (citing *Trammel v. United States,* 445 U.S. 40, 51 (1980)).

Mil. R. Evid. 503(a) expressly recognizes a clergy privilege and provides: "A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman or to a clergyman's assistant, if such communication is made either as a formal act of religion or as a matter of conscience."

A "'clergyman' means a minister, priest, rabbi, chaplain, or other similar functionary of a religious organization, or an individual reasonably believed to be so by the person consulting the clergyman." Mil. R. Evid. 503(b). "A communication is 'confidential' if made to a clergyman in the clergyman's capacity as a spiritual adviser . . . and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication." Mil. R. Evid. 503(b)(3). Mil. R. Evid. 503(c) broadly extends the privilege to allow either the communicant or the clergy member "on behalf of the person" to claim the privilege.[9]

"Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.'" *Trammel*, 445 U.S. at 50 (alteration in original) (citation omitted). "As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Id.* (citation omitted). "[I]t is legal error when the privilege is misconstrued." *Shelton*, 64 M.J. at 37.

Since Appellee is claiming the clergy privilege, he has the burden of establishing that his conversation was privileged under Mil. R. Evid. 503. *Id.* at 36. "[Mil. R. Evid.] 503 has three components pertinent to the present case: (1) the communication must be made either as a formal act of religion or as a matter of conscience; (2) it must be made to a clergyman in his capacity as a spiritual

---

[9] Air Force Instruction (AFI) 52-101, *Planning and Organizing*, 15 July 2019, is the current AFI for the Chaplain Corps. Chapter 5 of AFI 52-101 covers confidential and privileged communications. Paragraph 5.2 states, "Confidential communication is any communication made to a chaplain or Religious Affairs Airman by a military member, his/her authorized dependents, or other authorized personnel by military necessity, to include enemy prisoners of war, if the communication is made either as a formal act of religion or as a matter of conscience. A communication is also 'confidential' if made to a chaplain in the chaplain's official capacity as a spiritual advisor or to a Religious Affairs Airman in his or her official capacity." Paragraphs 5.3 and 5.4 cover the general rule of privilege and who may assert the privilege. Paragraph 5.5 discusses the parameters of privileged communications and confidential communications.

advisor or to his assistant in his official capacity; and (3) the communication must be intended to be confidential." *Id.* at 37.

"An 'act of religion' must comply with the particular tenets of a faith, but a 'matter of conscience' is privately held within a person." *Id.* at 38. "A communication is not privileged, even if made to a clergyman, if it is made for emotional support and consolation rather than as a formal act of religion or as a matter of conscience." *United States v. Napoleon*, 46 M.J. 279, 285 (C.A.A.F. 1997).

"[A]s is the case with the attorney-client privilege, the presence of third parties, [which is] essential to and in furtherance of the communication, does not vitiate the clergy-communicant privilege." *Shelton* 64 M.J. at 39 (second alteration in original) (citing *In re Grand Jury Investigation*, 918 F.2d 374, 377 (3d Cir. 1990)).[10] "It is sufficient here to conclude that this privilege is preserved where there is a 'relationship by blood or marriage' as well as a 'commonality of interest' between the accused and the third party present during the privileged communications." *Id. (*citing *In re Grand Jury Investigation*, 918 F.2d at 385–88).

## B. Analysis

The military judge's essential findings of fact and conclusions of law are supported by the record, *Gore*, 60 M.J. at 185, either directly, or through reasonable inferences that the military judge could reach from testimony and other evidence that was presented on the motion. Thus, the military judge did not abuse his discretion in concluding that Appellee's communications were protected in accordance with Mil. R. Evid. 503. This opinion considers in turn the three prongs of Mil. R. Evid. 503 as articulated in *Shelton*.

### 1. Appellee's Communication Made as a Matter of Conscience

In order to claim privilege under Mil. R. Evid. 503, Appellee must first show that his communication was made either as a "formal act of religion," or as "a matter of conscience." In evaluating this requirement, the military judge found as fact that (1) Appellee refused to meet with a therapist or counselor, but was willing to meet with the family members in the presence of a chaplain; (2) a prayer was said at the meeting; (3) the purpose of the meeting was to help the

---

[10] As also noted in the dissent in *Shelton*, "the existence and applicability of the clergy privilege may be undermined by the presumption 'that communications that take place in the presence of *third parties* are not confidential.'" *Shelton*, 64 M.J. at 45 (Crawford, J., dissenting) (emphasis added) (citing *In re Grand Jury Investigation*, 918 F.2d at 385 n.15); *cf. Pereira v. United States,* 347 U.S. 1, 6–7 (1953) ("The presence of *a third party* negatives the presumption of privacy." (emphasis added) (citation omitted)).

family resolve the dispute and "move on;"[11] (4) Appellee was seeking to heal the family; (5) Appellee "was not seeking emotional support, but rather forgiveness or at least understanding from the family and guidance or counseling from the Chaplain;" and (6) Appellee wanted "to admit what he may have done and to resolve the matter with the family." The military judge concluded that Appellee's communications were both a "formal act of religion" and a "matter of conscience."

The Government argues that our superior court, the United States Court of Appeals for the Armed Forces (CAAF), has interpreted the language "act of religion" to be an act that "must comply with the particular tenets of a faith," *Shelton*, 64 M.J. at 37–38, and that there are no findings of fact that "the family was engaging in a formalized religious ritual, proceeding, or act." In this case, the only tie the military judge made between the 'family session' and an act of religion was in finding that Appellee attended 'the family session' 'for religious purposes.'" The Government also argues the military judge did not make a finding of fact as to what the "religious purposes" were but stated that Appellee's "goal was for the entire family to get past the issues" and he "wanted to get his relationship with his wife back on track and save his marriage." Further the Government asserts that "[t]he military judge made no finding of fact tying Appellee's marriage to religion or spirituality," and therefore abused his discretion.

The evidence presented before the military judge does not support a finding that Appellee's communications were a formal act of religion. Appellee did not testify, nor did the military judge find as fact, that the family meeting with Chaplain RD was a religious encounter associated with a particular faith, and as such, there were not enough facts to reasonably conclude this point as a matter of law. Although the military judge erred on this part of the first prong, it is important to note that this opinion is not making a credibility determination, or questioning the truthfulness of any religious beliefs Appellee may have, nor is it interpreting what religion may mean to Appellee. There is insufficient evidence in the record to support the finding on this particular issue.

Although the military judge found Appellee's communications were both a formal act of religion and a matter of conscience, the focus is whether Appellee's communications were a "matter of conscience"—the second part of the first prong in *Shelton*. A "matter of conscience," which is "privately held within

---

[11] The court notes that neither the parties, nor the military judge specifically describe what "the dispute" was, or what the family members meant by "move on." However, the record is clear that the purpose of the meeting was to discuss Appellee's alleged acts of using his cell phone to make recordings of his sister-in-law, ER, which was a source of marital and familial discord.

a person," is necessarily subjective. What constitutes a "matter of conscience" is not defined in the *Manual for Courts-Martial*, nor is there military case law that defines what constitutes a "matter of conscience." Further, there are limited examples in case law of what constitutes a "matter of conscience." One such case is *United States v. Isham*, 48 M.J. 603 (N.M. Ct. Crim. App. 1998). In *Isham*, while the court did not define "matter of conscience," it did list examples of how the appellant in that case met the criteria of making a communication that was considered a matter of conscience. The appellant in *Isham* was suffering from depression and had suicidal ideations and revealed plans to shoot others and kill himself. The government argued that the chaplain was acting more like a social worker than chaplain, and the appellant was looking for a "mere referral" service. The court noted,

> While the testimony at trial did not establish that the two prayed together, [that] the appellant sought or received absolution, or [that] there was any other particular religious formality or content, absent strong evidence to the contrary, a service-member who meets with the chaplain under these circumstances makes the communication as an apparent act of conscience or contrition while the chaplain is in his role as a spiritual adviser."
> *Id*. at 605–06 (citation omitted).

Black's Law Dictionary defines "conscience" as

> [t]he moral sense; the faculty of judging the moral qualities of actions, or of discriminating between right and wrong; particularly applied to one's perception and judgment of the moral qualities of his own conduct, but in a wider sense, denoting a similar application of the standards of morality to the acts of others. The sense of right and wrong inherent in every person by virtue of his existence as a social entity; good conscience being a synonym of equity.

*Conscience*, BLACK'S LAW DICTIONARY, 303 (6th ed. 1990).

Merriam-Webster dictionary defines a matter of (individual) conscience as "something that people must decide about according to what they believe is morally right." MERRIAM-WEBSTER, *Matter of Conscience*, https://www.merriam-webster.com/dictionary (last visited 19 Feb. 2021). Both of these dictionary definitions provide insight that a "matter of conscience" could be read to encompass disclosures which seek to address or correct a wrong that a person may have committed, as in the case under review. Contrary to the Government's narrow approach, which would require an individual expressing a "matter of conscience" to be seeking spiritual absolution, there is no requirement in

the text of the privilege that a "matter of conscience" be religiously or spiritually based. The Government would have this court interpret "matter of conscience" to closely reflect practices similar to the Catholic church's rite of penance (confession) and not merely an "emotional unburdening." However, interpreting matter of conscience is not this stringent or restrictive. In fact, the Government's interpretation would result in "matter of conscience" being subsumed by "formal act of religion," thus reading the alternative structure out of the rule and rendering "matter of conscience" surplus. Further, the first prong in *Shelton* allows a communication to be a "formal act of religion" or "a matter of conscience;" it does not require both. Arguably, every Airman and Guardian has a right to consult with a chaplain, but not every Airman and Guardian may have a formal religion, or believe in a higher power.[12]

The record supports the military judge's findings of fact. According to GR, there was no family discussion about the alleged incidents as a family prior to the group session. GR asked BB if there was a possibility they could get a third party involved and mediate a discussion about what happened so that, in her words, the family could "move on." For GR, the purpose of this meeting was "family healing." GR wanted to let Appellee know that the family loved him and she wanted to be able to forgive him. BB and Appellee had previously met Chaplain RD for individual counseling; they had also met with her together on one occasion. BB stated Chaplain RD "was the only one who knew everything that had happened. She talked a lot about it in our other sessions." BB asked Appellee if he would be interested in meeting with the chaplain; he agreed, but, "made it pretty clear that he only wanted to speak to [Chaplain RD]." According to BB, Appellee, in general, "did not trust therapists or counselors very much" and she supposed he "had more faith in the process that [Chaplain RD] used." During the meeting, Appellee admitted to the group he recorded ER on multiple occasions and, according to GR, Appellee asked ER for forgiveness. Finally, it does not appear Appellee, who voluntarily went to this meeting, was seeking emotional support, but was expressing a matter of conscience.

In his conclusions of law when ruling on the Government's motion to reconsider, the military judge found that Appellee

---

[12] *See* U.S. CONST. amend. I. The Government's position leans heavily on Catholic doctrine and practice, which is fairly objective in nature. This argument poses the danger of improperly invoking the court's consideration and determination of one religion's parameters, against not only other religions, but the moral compasses of individuals. It is not appropriate to make this comparison and choose to avoid resolving controversies about a religion's or a church's doctrinal or governing procedures and making a credibility determination as to whether Appellee sought spiritual absolution.

> was seeking to heal the family rift so they could move on and not seeking emotional support, but rather forgiveness or at least understanding from the family and guidance or counseling from the Chaplain . . . [Appellee] viewed this meeting as being for religious purposes . . . [and] thought his communication was made for religious purposes. [Appellee] refused to meet with a therapist, but was willing to meet with the family members in the presence of a chaplain . . . [Appellee's] statement was a matter of conscience to admit what he may have done and to resolve the matter with the family. As such, the communication is both a formal act of religion and a matter of conscience.

One need not decide whether these findings are of fact, or both fact and law. It suffices that the evidence from the record and the law supports the military judge's determination that Appellee's communications were made as a matter of conscience. Thus, the military judge did not abuse his discretion in his application of this part of the Mil. R. Evid. 503 prong.

### 2. Appellee's Communication Made to a Clergyman as a Spiritual Advisor

The military judge found that Chaplain RD "clearly believed she was acting in this meeting in her capacity as a spiritual advisor." The military judge also found that Chaplain RD previously met BB and Appellee for counseling. As for the family gathering in February 2015, the military judge found that Chaplain RD initiated the discussion at the chapel. He found Appellee was "looking back and forth between ER and Chaplain RD when he made the statements" that the Government seeks to introduce against Appellee in its case. He found the chaplain said a prayer, and offered religious literature. In the military judge's conclusion of his second ruling, he stated,

> [T]he reason for the statements was to help the family heal and move on. As such, the statements were really to all of those present at the meeting—the family members and the Chaplain. The statements [Appellee made] were to the family members to admit what he had done and to the Chaplain to seek any guidance or counselling.

The Government argues the military judge abused his discretion by failing to analyze whether Chaplain RD was acting as an advisor in a secular role, instead of a spiritual role, explaining that Chaplain RD was "at best a mediator," and that Appellee's statements were not made to obtain spiritual advice or guidance, nor was the family meeting "overtly religious." The Government analogizes two examples where courts found that a clergyperson received com-

munications, but was not acting as a spiritual advisor. In *Napoleon*, the appellant made statements to an active duty friend, an enlisted member, acting in the capacity as a "lay minister." 44 M.J. at 542. The CAAF found the term "lay minister" was "ambiguous and could cover a broad range of persons, including musicians, ushers, and various attendants to the person presiding at a religious service." *Id.* at 544. In *Coleman,* the appellant made statements to his father-in-law who happened to be a minister, but who was not acting in a spiritual capacity at the time of the communication. 26 M.J. at 410. However, there is little similarity between *Napoleon* and *Coleman* and this case. The testimony established that Chaplain RD was neither a lay minister, nor was she related to Appellee or a friend of anyone at the meeting; instead, she was an active duty Air Force chaplain acting in the scope of her official duties, who was sought after because she was a chaplain.

Additionally, the military judge did not abuse his discretion by failing to analyze whether Chaplain RD was acting more as a secular advisor to the family than as a spiritual one. Members of the chaplaincy corps may engage in other roles, such as administrative and organizational work, as well as provide supervision for other clergymen or clergywomen*,* or lay workers. As such, the clergy privilege would not extend to nonconfidential communications during administrative, supervisory, or other counseling not provided as an act of religion or matter of conscience. However, as noted in *Scott v Hammock,* 870 P.2d 947, 956 (Utah 1994), clerics, serving in their religious role pursuant to the practice and discipline of the church, must engage in many communications that would not necessarily be deemed a "confession," but should nevertheless fall within the privilege. "In counseling parishioners in religious and moral matters, clergy frequently must deal with intensely private concerns, and parishioners may be encouraged, and even feel compelled, to discuss their moral faults." *Id.* at 952.[13] In *People v. Bragg*, citing to *Scott*, P.2d at 952, the court stated, "Even in a 'counseling' session with a cleric, the congregant might make many 'confidential' disclosures amounting to the confession of sin or other privileged communications. The informality of the meeting should not define the scope of the privilege." 824 N.W.2d 170, 187 (Mich. Ct. App. 2012).

---

[13] In its brief to this court, the Government cited Air Force Policy Directive 52-1, *Chaplain Corps*, ¶ 3.2 (5 Nov. 2018), acknowledging that a chaplain's role is understood to accommodate

> religious needs, provide religious and pastoral care, and advise commanders on the complexities of religion with regard to its personal and mission, as appropriate. As military members, chaplains are uniquely positioned to assist Service members, their families, and other authorized personnel with the challenges of military service as advocates of religious, moral, ethical, and spiritual well-being and resiliency.

The military judge's findings of facts show this was not exclusively a secular conversation. The facts show the group spoke of the accusations levied against Appellee, that according to BB, Appellee wanted to meet with the chaplain for spiritual reasons, and as GR testified, GR wanted to be able to forgive Appellee. The location where the meeting took place, what the chaplain was wearing, whether the family was or was not overtly religious, and what religious accoutrements and icons adorned the walls, things which suggest a more secular connotation to this family meeting, are simply not determinative to this particular case. The military judge did not abuse his discretion in finding Appellee's communications were made to Chaplain RD, a clergywoman, acting in her official capacity as a spiritual advisor.

### 3. Appellee Intended Communication to be Confidential

In his first conclusions of law, the military judge ruled,

> The third part of the test is that the communication must be intended to be confidential. Having additional parties present would normally breach a privilege; however, case law is clear that the privilege is preserved when the third party is a "relationship by blood or marriage" and there is a "commonality of interest" between the accused and the third party present during the privileged communications. Here the other members of the family have the proper relationship and there was a commonality of interest as described above in the spiritual reasons for the meeting. Moreover, the rule provides that the communications are still confidential if the additional persons are those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication. Here, the purpose of the communication was to repair the family relationship so the other family members did further the purpose of the communication and their presence was necessary. The other family members needed to be there so that [ER] and the [Appellee] could clear the air and so that all of the family members could move on as a family. As such, the third part of the test is met.

The record again lends support for the military judge's findings and conclusions of law. In terms of confidentiality, BB believed the discussion was a "private meeting." BB believed the meetings she had one-on-one with the chaplain were confidential, as well as the meeting she had with the chaplain and Appellee. MR thought the meeting was meant to be "private between family and the chaplain." Chaplain RD stated she "very vaguely recall[ed] this family meeting." It was the chaplain's understanding that this was a confidential meeting,

and that based on her training and the Air Force Instructions, "group counseling sessions are confidential." Chaplain RD further stated it was her understanding that when a person comes to speak with the chaplain "that all communication is privileged, unless we are given written permission by the individual or individuals to divulge, [and] that also has to be notarized." Appellee testified that he "one hundred percent" believed the meeting was confidential, as he had been advised during his career that "going to a chaplain was confidential." Even with others in the room, Appellee still believed the meeting was confidential.

In *Shelton*, the CAAF concluded that the clergy privilege is "preserved where there is a 'relationship by blood or marriage' as well as a 'commonality of interest' between the accused and the third party present during the privileged communications." 64 M.J. at 39. With this holding as a guide, the confidentiality prong can be addressed in the following three parts: (1) relationship by blood or marriage between Appellee and the parties present, (2) commonality of interest between Appellee and the parties present during the privileged communication, and (3) presence of the parties "in furtherance of the purpose of the communication" made to a clergywoman.

### a. Relationship of the parties

The military judge properly concluded that the family members had the proper relationship. Additionally, the Government's assertion that a "relationship by blood or marriage" does not include in-laws, is not persuasive. Our superior court's holding in *Shelton* clearly supports a finding that the presence of certain persons other than the declarant does not vitiate the clergy privilege and that the military judge's conclusion of law on this point was not an abuse of discretion. 64 M.J. at 39.[14]

---

[14] In *In re Grand Jury Investigation*, the Third Circuit Court of Appeals explained,

> We discern nothing in modern clergy-communicant privilege doctrine, as it finds expression in either proposed [Fed. R. Evid.] 506 or the cases recognizing the privilege that would limit the privilege's application solely to group discussions involving family members related by blood or marriage. . . . As is the case with consultations between attorneys and clients, the presence of multiple parties, unrelated by blood or marriage, during discussions with a member of the clergy may, but will not necessarily, defeat the condition that communications be made with a reasonable expectation of confidentiality in order for the privilege to attach.

918 F.2d at 386.

### b. Commonality of Interest

The military judge found the presence of the third parties was necessary, disclosure was in furtherance of the purpose of the communication, and that there was commonality of interest in having the meeting "for the entire family to get past the issues" and for "spiritual reasons." In analyzing *Shelton*, it is important to note the commonality of interest involving the appellant's wife as a third party and how she played a "pivotal role [in] sending" her husband to their pastor. 62 M.J. at 39. This simple analysis indicates that the notion of what constitutes a commonality of interest—language that does not appear in a plain reading of Mil. R. Evid. 503, and scantily appears in case law (in the clergy context)—is a low burden for Appellee to prove. In arguing that Appellee clearly intended multiple third parties to know of his communication, the Government concedes at least one commonality of interest between the parties in this family meeting, in that they all knew that the purpose of gathering in the presence of the chaplain was for Appellee to disclose his actions in allegedly recording ER. This concession goes to the heart of the military judge's ruling, where the purpose of Appellee's communication was "to repair the family relationship." The military judge found Appellee's "other family members needed to be there so that ER and [Appellee] could clear the air and so that all of the family members could move on as a family."

With this said, while there may not be a per se limit on how many people could be privy to a communication, the more people who are exposed to a communication, one could reasonably assume a greater expectation of scrutiny, with a lesser likelihood of a commonality of interest amongst those parties.

The military judge did not abuse his discretion in finding there was a commonality of interest between the family members present.

### c. Presence of the parties was "in furtherance of the purpose of the communication" made to a clergywoman

The Government argues the military judge abused his discretion in finding that Appellee's statements were "confidential" communications, because of the presence of these family members, and that Mil. R. Evid. 503 should be read "plainly," which requires that a communication must be made "to a clergyman." According to the Government, once Appellee directed his communications towards all parties at the meeting, the privilege did not apply. Distinguishing the facts of *Shelton,* the Government takes a restrictive position on the meaning of confidentiality.

The appellant in *Shelton* confessed to sexual abuse of his stepdaughter to his civilian pastor. After the confession, the pastor told the appellant to bring his wife to the chapel to join the discussion, which the appellant did. Although the appellant did not expressly confess to the sexual abuse, he did tell his wife,

"I did it. I did it. I'm wrong. I did it." After the conclusion of the consultation, the pastor told the appellant that state law required him to report the abuse. The appellant's wife ended up reporting the sexual abuse after the pastor told her if she did not report her husband, he would. 64 M.J. at 34–35. The distinction the Government makes is that in *Shelton*, the appellant did not want his wife to know what he revealed to the chaplain, whereas in Appellee's case, he "explicitly wanted" the family to hear his communication, and in fact, "he directed it toward them." The Government argues that Appellee's communications can only be considered confidential if they are made to a clergyman, and not anyone else, and by finding that the statements were made "towards the family," the military judge expanded the privilege beyond its plain language.

Yet, the law does not say the communications are confidential if *only* made to a clergyman; it just says *to* a clergyman. To read the rule so plainly and so restrictively is to ignore that the law accepts the possibility of having a third party present, who has a commonality of interest, when the communications are made, as discussed. For instance, if a husband and wife are meeting with a chaplain and the husband confesses to his wife that he has committed adultery and asks for forgiveness, it is unreasonable to think he would have a one-way discussion with the chaplain. The military judge found that Appellee was looking back and forth when he made statements to both Chaplain RD and ER, supported by the fact that ER testified that Appellee primarily looked at Chaplain RD when he spoke. The military judge did not abuse his discretion in concluding Appellee's statements were made to the chaplain.

The military judge also did not abuse his discretion in finding that the family members present were in furtherance of Appellee's communications. On this point, the Third Circuit Court of Appeals in *In re Grand Jury Investigation* noted,

> Modern clergy-communicant privilege doctrine focuses, rather, on whether the presence of a third party is essential to or in furtherance of a communication to a member of the clergy. We think, consistent with the general constructional rule that evidentiary privileges should be narrowly construed, that recognition of the clergy-communicant privilege in this circumstance depends upon whether the third party's presence is essential to *and* in furtherance of a communication to a member of the clergy.

918 F.2d at 386. Without the family present, the chaplain present, and the parameters of how the Appellee would disclose what he allegedly did to ER, the family would not have been able to "clear the air and so the entire group could get past it and move on as a family," as found by the military judge.

Finally, the Government made an argument that there is no evidence in the record that *Chaplain RD believed* the presence of the family members would further Appellee's communication of a matter of conscience to her, nor did the military judge make a conclusion as to why the family members needed to be present, or needed to hear, Appellee's statements to the chaplain. The Government's position is that Appellee's communication to the third parties had to be for the purpose of facilitating Chaplain RD in providing advice or assistance to Appellee, yet it was the third parties who believed Chaplain RD's presence was necessary in furtherance of Appellee to communicate what he allegedly did to ER to them.

To support its argument, the Government states this is what happened in *Shelton*, where it was the pastor who decided that in order for the appellant to obtain absolution, he had to confess to his wife. The Government also points us to *Harpole*, 77 M.J. at 235, in which the CAAF looked at whether the third party's presence was in furtherance of the purpose of a communication in the context of the victim-advocate privilege under Mil. R. Evid. 514. The appellant in *Harpole* was accused of sexual assault. After the accusation was made, the appellant reported to the victim advocate that the victim had sexually assaulted *him*, and in the presence of a third party, told the victim advocate what happened. The CAAF found that the presence of the third party was not needed for appellant to disclose his communications to the victim advocate, and therefore the victim-advocate privilege did not apply to the appellant's communication. The CAAF stated, "The plain meaning of this phrase requires the communication to the third person to be for the purpose of facilitating the *victim advocate* in providing advice or assistance to the victim." *Harpole*, 77 M.J. at 236.

However, the Government's reliance on *Harpole* does not support its position. In her testimony, BB stated that she chose Chaplain RD to assist the family because "[Chaplain RD] was the only one who knew everything that had happened. [Chaplain RD] talked a lot about it in [her] other sessions," and that Appellee "made it clear that he only wanted to speak to [Chaplain RD]. He in general didn't trust therapists or counselors very much." It can be reasonably inferred that Chaplain RD, as a spiritual advisor, knew exactly why she was meeting with the family, and as a gatekeeper to the privilege, allowed the presence of the family members for the purpose of facilitating spiritual advice and family healing, with the purpose relating back to Appellee's disclosure of a matter of conscience regarding wrongs he allegedly committed against ER. If nothing else, *Harpole* actually strengthens Appellee's position.

The military judge did not abuse his discretion in finding Appellee's communications were made confidentially, and together with his other findings

and conclusions, his rulings to exclude evidence of Appellee's communications under Mil. R. Evid. 503 were not an abuse of discretion.

## III. CONCLUSION

The appeal of the United States under Article 62, UCMJ, is **DENIED**.


POSCH, Senior Judge (concurring in part and in the result):

I agree with Judge Meginley that this court has jurisdiction. I also agree with his conclusion on the applicability of the privilege to exclude evidence because the military judge's essential findings are neither arbitrary, fanciful, clearly unreasonable, nor clearly erroneous. *See United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998). I write separately to articulate the findings that are necessary to resolve the appeal and because the language of Mil. R. Evid. 503 and the decisions of the United States Court of Appeals for the Armed Forces (CAAF) are adequate to reach a result.

Military Rule of Evidence 503 casts a veil of privilege over communications to a spiritual advisor that are made "as a matter of conscience" and that are "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication." The military judge did not abuse his discretion when he excluded evidence of communications Appellee made in the presence of his wife and his wife's family when they met with a military chaplain.

### A. Military Judge's Factfinding

Appellee agreed to meet with the chaplain because he sought to mend the relationship with his wife and save their marriage. Their relationship was strained because Appellee had given his wife reason to believe he made visual recordings of her sister, a minor, with his cell phone. Appellee was not willing to discuss his actions with a counselor or therapist, but he was agreeable to a family meeting with the same chaplain from whom Appellee and his wife had previously sought guidance. Although not necessary to resolve the appeal, Appellee had previously met with the chaplain on his own, which may have factored into the military judge's assessment of Appellee's sincerity and candor about why he was agreeable to the meeting and its purpose.

On direct examination, Appellee gave an oblique answer to a question posed by his counsel who asked him, "[W]hy was it important to you to make statements only to the [c]haplain . . . ?" Appellee replied in simple terms, "For religious purposes." Then, in response to the very next question about the "goal of that meeting," Appellee explained that he wanted to "eventually to be on track and allow [their] family to move forward and keep [their] marriage."

19

Later, and in response to a question posed to him by the military judge, asking "what was the religious aspect" to the meeting, Appellee replied, "[i]t was a spiritual issue," which included "having guidance from a [c]haplain" to put the relationship with his wife "back on track" and "save [their] marriage."

Consistent with Appellee's testimony, the military judge found Appellee's purpose was "to admit what he may have done and to resolve the matter with the family." In his first written ruling, the military judge found "spiritual reasons for the meeting," in line with Appellee's testimony. In his written ruling denying the Government's motion for reconsideration, the military judge found Appellee "was seeking to heal the family rift so they could move on." The military judge determined Appellee "was not seeking emotional support," which the CAAF found disqualifying in *United States v. Napoleon*, 46 M.J. 279, 285 (C.A.A.F. 1997), "but rather [Appellee sought] forgiveness[1] or at least understanding from the family and guidance or counseling from the [c]haplain."

"Credibility is an important component of factfinding." *Peterson*, 48 M.J. at 83. Appellate courts "defer to the military judge's assessment of the credibility of the witnesses" when determining if a military privilege applies to exclude evidence. *Id.* Considering Appellee's testimony along with evidence about the circumstances of the meeting at the base chapel, the military judge did not err when he credited Appellee's testimony and assigned a religious purpose to the family meeting.

**B. Matter of Conscience**

In *United States v. Shelton*, 64 M.J. 32 (C.A.A.F. 2006), the CAAF described the clergy privilege as "[o]ne of the most sacred." *Id.* at 33 (quoting *United States v. Benner*, 57 M.J. 210, 212 (C.A.A.F. 2002)). Observing that "a 'matter of conscience' is privately held within a person," *id.* at 38, our superior court explained that Mil. R. Evid. 503 "'recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.'" *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). Before *Shelton*, our superior court consistently acknowledged this language in *Trammel* when it applied Mil. R. Evid. 503 to the facts of a particular case.[2] In *Napoleon*, the CAAF looked to *Trammel* to evaluate if an appellant's admissions were a "formal act of religion" or made "as a matter of conscience," ultimately

---

[1] Appellee's mother-in-law testified that Appellee asked "for forgiveness" from his sister-in-law.

[2] *See United States v. Napoleon*, 46 M.J. 279, 285 (C.A.A.F. 1997); *United States v. Benner*, 57 M.J. 210, 212 (C.A.A.F. 2002); *United States v. Coleman*, 26 M.J. 407, 410 (C.M.A. 1988).

concluding "that appellant was seeking emotional support and consolation, not guidance and forgiveness." 46 M.J. at 285.

The military judge found Appellee's communication to his wife and her family were made as a matter of conscience. In this regard, the finding is in accord with the explanation of the privilege by our superior courts in *Trammel* and *Shelton* and is entitled to some deference.[3] To reach this conclusion, the military judge again relied on Appellee's testimony. He also relied on evidence that the chaplain started the meeting, said a prayer, and gave guidance in the form of religious literature. The military judge also found convincing that Appellee was willing to meet with his wife and her family in the presence of a chaplain, but refused to meet with a therapist or counselor. The military judge found that Appellee's wife related to special agents of the Air Force Office of Special Investigations that she remembered Appellee "mentioning wanting to only talk to a clergy member due to spiritual reasons."[4]

In keeping with *Trammel* and *Shelton*, the military judge's factfinding supports the conclusion that Appellee divulged "flawed acts" involving his minor sister-in-law in a setting that was conducive to Appellee receiving guidance from a chaplain in return. To be sure, there is no indication Appellee sought absolution as a Catholic priest might be asked to grant forgiveness of sins. However, the term, "matter of conscience," where it appears in the rule would be superfluous if it did not transcend formal acts of religion premised on Judeo-Christian ideas of forgiveness and redemption. Because matters of conscience are "privately held within a person," *Shelton*, 64 M.J. at 38, the term is at once intrinsically subjective and comprehensive. A fair reading is that it spans beliefs and values as might be drawn externally from religion or ethics, or that are spiritual or moral from within.

The military judge found spiritual reasons for the gathering, and that Appellee ascribed a religious purpose to the meeting. In line with Appellee's understanding, Appellee wanted to reconcile with his wife and her family and he hoped to save his marriage by divulging that he made recordings of his sister-in-law. The military judge also found the chaplain believed her role in the meeting was that of a spiritual advisor, and the record supports the conclusion

---

[3] *See United States v. Shelton*, 64 M.J. 32, 37 (C.A.A.F. 2006) ("Whether a communication is privileged is a mixed question of fact and law. We will give the military judge's findings of fact deference, reversing such findings only if they are clearly erroneous, while we review the legal conclusions de novo." (footnotes and citations omitted)).

[4] Appellee's wife testified differently. When questioned whether Appellee wanted to meet with a chaplain "for spiritual reasons," she replied, "I think so, but I can't say for sure." Nonetheless, the record supports the military judge's factfinding that Appellee met with the chaplain to reconcile with his wife and her family and save his marriage.

that she acted in that capacity and no other. Likewise, the military judge found Appellee sought guidance or counseling from the chaplain. Considering the chaplain's role, the religious setting and purpose, and Appellee's goals, the military judge did not abuse his discretion in finding that Appellee's communications were made as a matter of conscience.

**C. Confidentiality**

The chaplain believed her session with the family was confidential. Appellee shared this understanding, and the military judge credited both testimonies to reach the conclusion that Appellee's communication at the meeting was meant to be confidential.

When third persons are present during a communication made to a chaplain, the communication is nonetheless confidential so long as disclosure to third parties "is in furtherance of the purpose of the communication." Mil. R. Evid. 503(b)(3). This is so because the presence of third parties "essential to and in furtherance of the communication, does not vitiate the clergy-communicant privilege." *Shelton* 64 M.J. at 39 (citing *In re Grand Jury Investigation*, 918 F.2d 374, 377 (3d Cir. 1990)). Although our superior court in *Shelton* did not find it necessary to "define the precise parameters of preserving [a] privileged communication made in the presence of third parties," the Court found that under the circumstances in that case, which involved a husband and wife, the "privilege is preserved where there is a 'relationship by blood or marriage' as well as a 'commonality of interest' between the accused and the third party present during the privileged communications." *Id. (*citing *In re Grand Jury Investigation*, 918 F.2d at 385–88).

Appellee testified generally about the intrusion of his in-laws in his marriage, and that the family meeting was meant to address an "entanglement between in-laws and also [his] wife." In accord with his testimony, the military judge found the presence of Appellee's wife and her family at the meeting was necessary because the purpose of Appellee speaking at the meeting was to repair the family relationship. Considering that Appellee's goal was to save his marriage after his wife and her family believed he had made furtive recordings of his sister-in-law, the military judge did not abuse his discretion in finding a commonality of interest between Appellee, his wife, and her family. The record supports the conclusion that the presence of Appellee's wife and in-laws was essential to and "in furtherance of the purpose of the communication." Mil. R. Evid. 503(b)(3). Consequently, Appellee's communications disclosed to his wife and her family are afforded confidentiality to the same extent as Appellee's confidential communications to the chaplain in her capacity as a spiritual adviser.

For these reasons, the military judge did not abuse his discretion in his application of Mil. R. Evid. 503 to exclude evidence of Appellee's communications, and I concur in the result.


RICHARDSON, Judge (dissenting):

I disagree with the opinion of my colleagues that Appellee's communications were a matter of conscience and confidential under Military Rule of Evidence (Mil. R. Evid.) 503. I would grant the United States' appeal, and reverse the military judge's ruling that allows Appellee to assert the clergy-penitent privilege to exclude evidence of communications he made to his then-wife's family. Viewing the evidence in the light most favorable to Appellee, as the prevailing party on the motion at trial, I find the military judge misconstrued the privilege and abused his discretion. *See United States v. Shelton*, 64 M.J. 32, 37 (C.A.A.F. 2006).

"Because privileges 'run contrary to a court's truth-seeking function,' they are narrowly construed." *United States v. Jasper*, 72 M.J. 276, 280 (C.A.A.F. 2013) (quoting *United States v. Custis*, 65 M.J. 366, 369 (C.A.A.F. 2007) (considering waiver of the clergy-penitent privilege under Mil. R. Evid. 510).

At the outset, I highlight two findings of fact that are not supported by the record and significantly impact analysis of the issues. The military judge found "BB stated that it was [GR's] idea to have the family meeting with the chaplain" and "[GR] suggested the entire family meet with the base chaplain." In fact, the record shows it was GR's idea to have a meeting, but not necessarily with a chaplain. GR testified:

> So I asked [BB] if there was a possibility that we could have a third party involved and mediate for us so that we could get it out in the open and move on. . . . So she had been seeing a counselor and she had seen the Chaplain before and I suggested either one of those and then [BB] set it up.

In BB's statement to agents from the Air Force Office of Special Investigations (AFOSI) and her testimony at trial, BB stated it was GR's suggestion to have the meeting; BB considered whether to meet with a therapist or the chaplain; and when she approached Appellee about attending a meeting, he was only willing to meet with the family with a chaplain and not a therapist. BB also wanted to meet with Chaplain RD because she "was the only one who knew about everything that had happened" from their prior meetings. BB did not testify about how she arranged the family meeting with Chaplain RD or what she told Chaplain RD about the intent for the meeting.

Contrary to the conclusion reached in the lead opinion, the record does not support a finding that Chaplain RD explained the purpose of the meeting at the outset. The military judge found as fact in his first and second rulings, respectively, that "Chaplain [RD] started the meeting by explaining why they were there" and "Chaplain [RD] began the family session; she explained their purpose in being there—something she knew from a discussion with [BB] prior to the session." The military judge did not further make a finding about what that "purpose in being there" was. The evidence supports only a conclusion that Chaplain RD began the meeting, which fact alone has little relevance to the issue at hand. GR testified: "The Chaplain opened the discussion about, you know, just kind of like a—she was trying to understand why we were there and what we wanted from our meeting." ER did not recall what Chaplain RD said at the beginning of the meeting, but at some point she said "the goal was for everybody to be together when we leave." BB remembered Chaplain RD opened the meeting by introducing herself to the family. Chaplain RD testified, but she had a "very vague[ ] recall" of the meeting and could not testify about whether she said anything in particular at this meeting. Even Appellee did not testify that Chaplain RD started the meeting with an explanation of its purpose. When answering the military judge's question about the "religious aspect" of the meeting, Appellee testified: "When we were in the room, I remember her introducing yourself [sic] as a Chaplain, her speaking about her roles, and just—yeah, that's about it I guess."

## A. Formal Act of Religion or Matter of Conscience

I agree with the lead opinion on this first point: the military judge's conclusion that Appellee's communication was part of a formal act of religion is error. Moreover, I would find it not only is unsupported by fact but demonstrates an incorrect application of the law. An "'act of religion' must comply with the particular tenets of a faith." *See Shelton*, 64 M.J. at 37. The military judge made no findings about Appellee's faith or any tenets of that faith. His discussion includes no facts or analysis that would indicate he differentiated a formal act of religion from a matter of conscience.

I diverge from the views of my colleagues on the second point. I would find the military judge abused his discretion when he accepted Appellee's conclusions that his communications were religious and spiritual in nature without any reasonable explanation of how they were a matter of conscience. Moreover, I find "matter of conscience" must relate to the role of the clergy for Mil. R. Evid. 503 to apply, and cannot be wholly secular in nature.[1]

---

[1] "Secular" as used here is distinguished from religious, moral, ethical, or spiritual.

"Matter of conscience" has not been well defined in our jurisprudence. The clergy-communication privilege originated in the Army as a privilege between an Army chaplain and a communicant, and covered communications made "either as a formal act of religion or as a matter of conscience to a chaplain." Rule of Evidence 137*b (Communications between Husband and Wife, Attorney and Client, and Chaplain and Communicant)*, *Manual for Courts-Martial, United States Army* (1949 ed.). The privilege was broadened in the first uniform Manual for Courts-Martial, to include not only chaplains but "priests and clergymen of any denomination." Rule of Evidence 151*b*(2), *Manual for Courts-Martial, United States* (1951 ed.). The nature of the covered communications did not significantly change; the privilege protected those made "either as a formal act of religion or concerning a matter of conscience." *Id.* As a result of amendments to the Military Rules of Evidence in 1980, the clergy privilege became a stand-alone privilege, designated Mil. R. Evid. 503. *See Manual for Courts-Martial, United States*, App. 22, at A22-36 (1984 ed.). In the iterations of the privilege to the present day, the phrase "matter of conscious" has been undefined.

Given the history of this military privilege covering both religion and matters of conscience, and residing in communications to chaplains, it is useful to look to the scope of the practice of military chaplains to determine what nature of communications to clergy should be covered by Mil. R. Evid. 503. Here, Air Force Policy Directive 52-1, *Chaplain Corps*, ¶ 3.2 (5 Nov. 2018), cited by the Government and noted in the lead opinion, provides some assistance in understanding how clergy assist with matters of religion and conscience: "chaplains are uniquely positioned to assist Service members, their families, and other authorized personnel with the challenges of military service as advocates of *religious, moral, ethical, and spiritual well-being and resiliency*." (Emphasis added). Thus, the prerequisite in Mil. R. Evid. 503 that communications are protected if made either as a formal act of religion or as a matter of conscience generally is met when the communication relates to formal or informal religious, moral, ethical, or spiritual purposes. This conclusion is not novel; my colleagues find a similar breadth of "matters of conscience," albeit via different avenues.

Before this court, Appellee's counsel argued Appellee's communications were for "forgiveness" and "unburdening," however no such goals are present in the record. In this regard, the end of Appellee's direct examination is most telling:

> [DC:] [Appellee], why was it important to you to make statements only to the Chaplain in February 2016?
>
> [Appellee:] For religious purposes.

[DC:] What was the goal of that meeting?

[Appellee:] Well, at the time, me, my in-laws, [BB], we had a very shaky relationship. We had a lot of problems. There was a lot of intrusion with in-laws so I was hoping at the time that when this was first scheduled by them it was something that was going to encompass all the issues in our relationship. So I was hoping we would actually get—my goal was eventually to be on track and allow our family to move forward and keep our marriage.

The military judge probed Appellee to explain "the religious aspect of the meeting." At first, Appellee did not appear to understand the question, as his answer was about the chapel and the chaplain's actions at the start of the meeting, discussed above. The military judge then narrowed his questions:

[MJ:] What exactly were you looking to get out religiously from the meeting?

[Appellee:] Oh.

[MJ:] I understand you were trying to work out issues with your in-laws and your wife, but what was the religious aspect of that?

[Appellee:] It was a spiritual issue, just one that I was hoping to get things that—like I said with our entire relationship back on track, having guidance from a Chaplain, being able to reiterate any issues or any—any entanglement as I think what—it was told before that we've had and just set our—basically save our marriage and set our path straight toward.

The military judge, in his second ruling, stated "In this case, the court has concluded that [Appellee] was seeking to heal the family rift so they could move on. He was not seeking emotional support, but rather forgiveness or at least understanding from the family and guidance or counseling from the Chaplain."[2] Yet the military judge did not make a finding of fact that Appellee sought forgiveness or understanding. And such a finding would have scant support from the record. Notably, Appellee did not testify that he attended the meeting in search of forgiveness or understanding—from anyone. Appellee gave no indication his communications were to admit or seek guidance for his "flawed act." *See Trammel v. United States,* 445 U.S. 40, 51 (1980).

---

[2] The military judge apparently tried to distinguish this case from *United States v. Napoleon*, 46 M.J. 279, 285 (C.A.A.F. 1997), which found a "communication is not privileged, even if made to a clergyman, if it is made for emotional support and consolation rather than as a formal act of religion or as a matter of conscience."

The record does not show how any communication Appellee made in this meeting to fix his relationship with his in-laws was a matter of conscience. While GR testified Appellee asked only the alleged victim to forgive him, the record does not show Appellee did this for a religious or spiritual purpose, but instead to achieve his stated goal of addressing the "entanglement between in-laws and also [his] wife." Nor does the record support a conclusion that Appellee made communications out of a sense of his own ethics or morals. The two purposes—that is, matter of conscience (whether religious, spiritual, ethical, or moral) and family healing—can overlap, but the record does not support a conclusion that they do in this case.

In his first ruling, the military judge made an inference from Appellee's stated goal. The military judge found: "The purpose of the meeting was to help the family resolve the dispute and move on. *If* that was the purpose of the meeting, *then* the Accused's statement was a matter of conscience to admit what he *may have done* and to resolve the matter with the family." (Emphasis added). The military judge does not explain in either ruling how Appellee admitting only that he "may have done" something is a confession or a communication made as a matter of conscience.[3] Moreover, one can only make an inference here, as Appellee did not testify that his intent was to confess—to anyone. Appellee had the burden of proof and persuasion on this motion. He presented evidence and called witnesses. He testified on his own behalf, and was examined by the Government and the military judge. Appellee failed to provide the link between his goal of untangling his issues with his in-laws and his conscience. The military judge supplied that link by making an inference, which my colleagues accept but I find was unreasonable in this case.

Assuming the military judge was rightfully cautious not to question the Appellee more about how his communications were a matter of conscience, lest he appear to place a value on Appellee's beliefs vice ascertaining what they even were, and one accepts Appellee's unsupported conclusion that his communications were a "spiritual" matter of conscience, the analysis does not end.

## B. Communications Made to a Clergyman

The record supports the conclusions that Chaplain RD was serving as a clergyman at the time of the meeting and also, albeit narrowly, that she was serving in her capacity as a spiritual advisor. The issue here is whether Appellee's communications which the Government seeks to introduce were made *to* Chaplain RD.

---

[3] Or as a formal act of religion, as the military judge next concluded in both his rulings.

At trial and in this appeal, Appellee focuses on whom Appellee was looking at during the meeting. I do not envision an unwieldy application of Mil. R. Evid. 503 that would require a finding about where an accused was looking at the time he made any given covered communication.[4] Instead, we can look to the rule itself, which protects "confidential communication by the person to a clergyman or to a clergyman's assistant," and to the intent of the privilege, including "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *United States v. Napoleon,* 46 M.J. 279, 285 (C.A.A.F. 1997) (citing *Trammel,* 445 U.S. at 51; *United States v. Coleman,* 26 M.J. 407, 420 (C.M.A. 1988)).

The military judge made findings in his second ruling that "When [Appellee] made the alleged admissions, he looked primarily at both [ER] and the Chaplain." In his analysis, which he captioned as "Conclusions of Law," he found as fact that:

> [Appellee] was looking back and forth between [ER] and Chaplain [RD] when he made the statements.[5] This fact alone would be enough to conclude that the statements were at least "to" both of them. More importantly, the reason for the statements was to help the family heal and move on. As such, the statements were really to all of those present at the meeting—the family members and the Chaplain. The statements were to the family members to admit what he had done and to the Chaplain to seek any guidance and counseling.

If Appellee intended Chaplain RD to hear his statements,[6] I am satisfied that he made them "to" her, even if he made them to other persons at the same time. The significance of the other parties present is germane to the last component—confidentiality.

---

[4] The military judge's findings show the difficulty and futility of such an approach.

[5] I note that while this finding is supported by the record, testimony from GR and BB would support the opposite conclusion—that Appellee was looking at only ER or his fingers while making the communications at issue.

[6] Appellee described Chaplain RD's actions during the meeting as "a few times minorly she interrupted and she also handed out I remember a religious book at the end" and "during the conversation, it was a very minor point, where she did interject and she did use a little bit of biblical" as she addressed the group.

## C. Confidentiality of Appellee's Communication

The issue presented here is one the United States Court of Appeals for the Armed Forces (CAAF) highlighted but did not squarely address in *Shelton*: the effect of the presence of a third party. To be clear, while similar, this is not an issue involving disclosure to "third persons" as that phrase is used in Mil. R. Evid. 503(b)(3) ("A communication is 'confidential' if . . . [it] is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication. . . ."). In *Shelton*, the CAAF did not invoke Mil. R. Evid. 503 to find the privilege was preserved. Instead, drawing on *In re Grand Jury Investigation*,[7] the CAAF upheld the privilege because the third party—the appellant's wife—was related to the appellant by marriage and shared a "commonality of interest" as she "played the pivotal role of sending [the a]ppellant to [the clergyman] in the first instance." *Shelton*, 64 M.J. at 39 (citing *In re Grand Jury Investigation*, 918 F.2d at 385–88). The CAAF continued:

> We need not presently define the precise parameters of preserving this privileged communication made in the presence of third parties. It is sufficient here to conclude that this privilege is preserved where there is a "relationship by blood or marriage" as well as a "commonality of interest" between the accused and the third party present during the privileged communication.

*Id*. (citing *In re Grand Jury Investigation*, 918 F.2d at 385–88). The CAAF repeated this view in *United States v. Harpole*, 77 M.J. 231, 235 (C.A.A.F. 2018), when considering the victim-advocate privilege under Mil. R. Evid. 514: "In other [Mil. R. Evid.] privilege contexts, we have declined to 'define the precise parameters of preserving . . . privileged communication made in the presence of third parties,' but we have recognized that a privilege still exists if 'there is a relationship by blood or marriage' as well as a 'commonality of interest' between the accused and the third party.'" *Id*. (citing *Shelton*, 64 M.J. at 39).

As demonstrated above, the military judge concluded Appellee's communications had dual purposes: (1) to repair his family issues, and (2) to seek counseling and guidance from a chaplain. In his initial ruling, he concluded that the presence of the family (third parties), who were necessary to address purpose (1), was in furtherance of purpose (2):

> Here the other members of the family have the proper relationship and there was a commonality of interest as described above

---

[7] The court in *In re Grand Jury Investigation* acknowledged and analyzed a federal common law privilege, not an evidentiary rule promulgated by the President. 918 F.2d 374 (3d Cir. 1990).

in the spiritual reasons for the meeting. Moreover, the rule provides that the communications are still confidential if the additional persons are those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication. Here, the purpose of the communication was to repair the family relationship so the other family members did further the purpose of the communication and their presence was necessary. The other family members needed to be there so that [ER] and [Appellee] could clear the air and so that all of the family members could move on as a family. As such, the third part of the prong is met.

The military judge's conclusions about purposes are not supported by the record. He did not find as fact that all the family was there for "spiritual reasons." He found that "[Appellee] went to the family session with Chaplain [RD] for religious purposes." The record supports a conclusion that perhaps BB attended the meeting because she wanted "a religious perspective," but it does not support a conclusion that any other family member had a desire for religious guidance. As discussed above, the military judge's finding that GR suggested a meeting with a chaplain—as opposed to any other mediator—is not supported by the record.

If the phrase "disclosed to third persons" in Mil. R. Evid. 503(b)(3) nevertheless should be construed as meaning "communicated to third parties," as the military judge and the lead opinion interpret the rule, both Appellee and Appellant agree that the "purpose" in the subsequent phrase "in furtherance of the purpose" relates back to "formal act of religion or as a matter of conscience" in Mil. R. Evid. 503(a) and not some other goal of the meeting (e.g., to repair the family relationship). The record is devoid of evidence to support even an inference that Appellee required the presence of the third parties in order to receive spiritual guidance and counseling from a chaplain. If Appellee agreed to attend a meeting with his in-laws only if a chaplain were present in order to benefit from the confidentiality he believed would protect his communications, the privilege may well attach if he also intended his communications as a matter of conscience. If he wanted to get his family's "relationship back on track" out of a sense of ethical duty or his own moral compass or for religious or spiritual reasons, such intent is not supported by the record in this case. All the reasons Appellee provided for attending the meeting with his extended family were for his own secular benefit; none were for religious, spiritual, ethical, or moral reasons, and thus none were a matter of conscience.

Appellee receiving spiritual guidance or counseling was not the "common interest" of the third parties. While the family were related to Appellee, their interests were not aligned. The family's purpose was not for Appellee to confess

to a chaplain or otherwise clear his conscience before a clergyman; they did not encourage him to seek any religious or spiritual guidance, as did the third party in *Shelton*, 64 M.J. at 39. As GR stated, they wanted to talk about the "elephant in the room"[8] with Appellee in the presence of a mediator. Again, assuming the meeting served two purposes—family healing and spiritual guidance—the third parties were present only for the former and, with the possible exception of BB, not to facilitate the latter. Therefore, the military judge erred when he found the statements met the rule's definition of confidential.

Similarly, the record does not indicate Chaplain RD required the presence of any third party to provide assistance to Appellee on a matter of conscience, and the military judge made no such finding. *See Harpole*, at 236 (finding Mil. R. Evid. 514(b)(3) by its express terms provides communications are confidential if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of advice or assistance to the alleged victim, i.e., "for the purpose of facilitating the *victim advocate* in providing advice or assistance to the victim.") The lead opinion cites *Harpole*, *supra,* to support its conclusion, and asserts Chaplain RD "knew exactly why she was meeting with the family, and as a gatekeeper to the privilege, allowed the presence of the family members for the purpose of facilitating spiritual advice and family healing." However, the record does not support its factual findings that Chaplain RD knew the purpose of the meeting beforehand or took any active role in determining who should be present.

The requirement that some third party be present for clerical assistance to be either received or given was evident in *Shelton*, but not here. In *Shelton*, "[s]ince [the clergyman] believed that [the a]ppellant's wife's presence was necessary for his redemption, [the a]ppellant brought his wife into the room where she learned that [the a]ppellant had been sexually abusing his stepdaughter." *Shelton*, 64 M.J. at 39. There, the appellant's wife was necessary for both the clergyman to give and the appellant to receive spiritual assistance; here, we have no such evidence. Again, while statements in this group counseling session could have been made as a matter of conscience, in this case the record supports only one reasonable conclusion: they were not.

---

[8] GR agreed with defense counsel that "the point of this meeting was family healing" and she "wanted to be able to forgive [Appellant]." She added she "wanted it to not be the white elephant in the room." When defense counsel next asked whether she "wanted [Appellant] to know that he had been forgiven," GR replied, "I wanted him to know that we loved him and that we still loved him." She agreed her "goal was to move on after this meeting," explaining she "didn't think [they] had a choice because they were going to stay together and [they] were going to still be a family."

While the witnesses all believed the meeting was "confidential" or "private," few elaborated on what that meant. Conspicuously absent is testimony about whether they believed any of the family was free to repeat any communications made at the meeting, or whether they felt as constrained as the chaplain from disclosing any communications.[9] The evidence shows at least one of the family spoke to AFOSI agents about what Appellee said at the meeting regarding ER. The record supports a finding that the parties—including the chaplain—assumed the meeting would have some level of privacy or confidentiality, but none was discussed. It is not reasonable to conclude that Appellee can claim a privilege that requires communications to a member of the clergy for a matter of conscience when Appellee's purpose was not for his "human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return" but to address his in-laws' grievances in person with a chaplain present. *See Trammel,* 445 U.S. at 51.

This court does not have the authority to create a "group" clergy-penitent privilege. It is the prerogative of the "policymaking branches of government" to "add exceptions to the codified privileges within the military justice system," not the Courts of Criminal Appeals. *Custis*, 65 M.J. at 369. If communications made to both clergy and third parties should be protected, the President may modify Mil. R. Evid. 503 accordingly. *See United States v. Slape*, 76 M.J. 501 (A.F. Ct. Crim. App. 2016) (recognizing Mil. R. Evid. 504 was amended so the word "child" would include someone for whom one of the spouses had physical custody, which amendment superseded the holding in *United States v. McCollum*, 58 M.J. 323 (C.A.A.F. 2003), rejecting this de facto interpretation of "child.")).[10] "[W]hereas privileges evolve in other federal courts based on case law determinations, in the military system the privileges and their exceptions are expressly delineated," *Custis*, 65 M.J. at 370–71, "to provide the certainty

---

[9] For example, in response to defense counsel's question to BB, "And you believe the [prior] meeting that you had with Chaplain [RD] and [Appellee] was confidential?" BB testified, "I—um, yeah, I don't believe that she was going to tell anybody, yes." The defense counsel then clarified, "So you believe that Chaplain [RD] would not talk with anyone about the meetings?" to which BB responded, "Right, yes."

[10] Federal law may recognize a "group" clergy-penitent privilege, but the facts do not support such a determination here. *In Re Grand Jury Investigation* is instructive, noting "in a situation where numerous persons, each seeking individual spiritual guidance, choose to meet as a group with a clergy member, a privilege does not exist unless, upon independent scrutiny, the 'essentiality and in furtherance' test is met." *In Re Grand Jury Investigation*, 918 F.2d at n.19. Here, in addition to not being essential for Appellee to receive spiritual guidance, the family members were not "each seeking individual spiritual guidance."

and stability necessary for military justice," *United States v. Tipton*, 23 M.J. 338, 343 (C.M.A. 1987).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court